**WASHINGTON LEGAL FOUNDATION, et al.,**

v.

**TEXAS EQUAL ACCESS TO JUSTICE FOUNDATION, et al.**

No. A–94–CA–081 JN.

United States District Court, W.D. Texas, Austin Division.

Jan. 28, 2000.

Steven W. Smith, Law Offices of Steven W. Smith, Austin, TX, Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, DC, for Washington Legal Foundation, William R. Summers.

Michael J. Mazzone, Dow, Cogburn & Friedman, Houston, TX, for Michael J. Mazzone.

Darrell E. Jordan, Hughes & Luce, L.L.P., Dallas, TX, H. Robert Powell, Hughes & Luce, Austin, TX, Brittan L. Buchanan, Hughes & Luce, L.L.P., Austin, TX, Richard A. Johnston, Hale and Dorr, L.L.P., Washington, DC, Francine Rosenzweig, Hale & Dorr, L.L.P., Boston, MA, Geoffrey S. Stewart, Jones, Day, Reavis & Pogue, Washington, DC, for Texas Equal Access to Justice Foundation.

H. Robert Powell, Hughes & Luce, Austin, TX, Brittan L. Buchanan, Hughes & Luce, L.L.P., Austin, TX, Richard A. Johnston, Hale and Dorr, L.L.P., David A. Wilson, Hale and Dorr, L.L.P., Washington, DC, Francine Rosenzweig, Hale & Dorr, L.L.P., Boston, MA, Geoffrey S. Stewart, Jones, Day Reavis & Pogue, Washington, DC, for W. Frank Newton, Chairman, Texas Equal Access to Justice Foundation.

Darrell E. Jordan, Hughes & Luce, L.L.P., Dallas, TX, H. Robert Powell, Hughes & Luce, Austin, TX, Harry G. Potter, III, Attorney at Law, Austin, TX, Brittan L. Buchanan, Hughes & Luce, L.L.P., Austin, TX, Nancy A. Trease, Assistant Attorney General, Austin, TX, for Thomas R. Phillips, Raul Gonzalez, Jack Hightower, Nathan Hecht, Lloyd A. Doggett, Bob Gammage, Craig T. Enoch, John Cornyn, Rose Spector.

Rande K. Herrell, Attorney General's Office, Austin, TX, for Supreme Court DFTS, defendant.

Scott J. Atlas, Vinson & Elkins, Houston, TX, J. David Bickham, Jr., Vinson & Elkins, Austin, TX, Robert A. Long, Jr., Caroline M. Brown, Covington & Burling, Washington, DC, Robbi B. Hull, Vinson & Elkins, LLP, Austin, TX, for Iolta Programs (NAIP), amicus.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

Before the Court is the above-entitled cause of action. A bench trial was held before this Court on September 22, 1999 and September 23, 1999. Plaintiffs submitted Plaintiffs' Post–Trial Brief (Clerk's Doc. No. 141) on November 2, 1999. Defendants submitted Defendants' Post–Trial Brief (Clerk's Doc. No. 143) on November 29, 1999. Having considered the testimony and evidence presented at trial, as well as the relevant law, the Court enters the following Opinion and Order. This Memorandum Opinion and Order constitutes the

Court's findings of fact and conclusions of law. *See* FED.R.CIV.P. 52(a).

## I. Procedural Background

The Plaintiffs in this cause of action are: the Washington Legal Foundation, a non-profit public interest law and policy center; Michael Mazzone, a Texas resident and attorney licensed to practice law by the State Bar of Texas; and William Summers, a Texas resident and consumer of legal services. Plaintiffs bring this case pursuant to 42 U.S.C. § 1983 asserting that Defendants' mandatory Interest on Lawyers' Trust Account ("IOLTA") program violates the First and Fifth Amendments of the United States Constitution. The IOLTA program is implemented and overseen by Defendant the Texas Equal Access to Justice Foundation ("TEAJF"). In 1984, the Texas Supreme Court Justices adopted Article XI of the Rules of the State Bar of Texas which established the IOLTA program. In 1988, the Justices made the program mandatory. This Court entered an order on January 4, 2000 dismissing the Texas Supreme Court Justices on the basis of legislative immunity.

By Order dated January 19, 1995, this district court granted summary judgment for Defendants on the basis that Plaintiffs could not establish a constitutionally cognizable property interest because, but for the IOLTA program, no interest could be earned on the funds in the IOLTA account. *Washington Legal Foundation v. Texas Equal Access to Justice Foundation*, 873 F.Supp. 1, 7 (W.D.Tex.1995). The Fifth Circuit reversed this court, concluding that the interest earned on client funds held in IOLTA accounts is a property interest within the reach of the Fifth Amendment. *Washington Legal Foundation v. Texas Equal Access to Justice Foundation*, 94 F.3d 996 (5th Cir.1996). The Supreme Court affirmed the Fifth Circuit's decision and determined that the interest income generated by the Texas IOLTA program is the "private property" of the owner of the principal. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 118 S.Ct. 1925,

1934, 141 L.Ed.2d 174 (1998). This holding was limited to its determination of the existence of a property interest in the interest income. *Id.* The Supreme Court remanded the case for consideration of whether or not IOLTA funds have been "taken" by the State, as well as the amount, if any, of just compensation due Plaintiffs. *Id.* Thus this Court must once again consider the fate of IOLTA.

## II. What is IOLTA?

The Texas Interest on Lawyers Trust Account ("IOLTA") is fashioned from a complex web of federal banking regulations, state law, Internal Revenue Service Rulings, and ethical rules. All these rules work in conjunction to create a unique class of revenue which the state then directs to the delivery of legal services to low income individuals.

In 1980 Congress passed legislation creating Negotiable Order of Withdrawal ("NOW") accounts, which allowed federally insured banks to pay interest on demand accounts. 12 U.S.C. § 1832. Absent an agreement with the client, Texas ethical rules require lawyers to keep client funds separate from the attorney's funds and that these funds be available to the client upon demand. TEX. DISCIPLINARY R. PROF. CONDUCT 1.14, *reprinted in* TEX. GOV'T CODE ANN., tit 2, subtit. G app. A (Vernon's Supp.1998) (TEX. STATE BAR R. ART. X, § 9). Before the creation of NOW accounts, lawyer trust accounts were almost without exception non-interest bearing accounts. Therefore, only banks benefitted from the deposits lawyers made into client trust accounts.

NOW accounts are permitted only for deposits that consist of funds "only where the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, political, or other similar purposes and which is not operated for profit." 12 U.S.C. § 1832(a)(2). For-profit corporations and partnerships are prohibited from earning interest on demand accounts. *Id.* The

Federal Reserve Board, however, has interpreted § 1832(a) to convey that corporate funds may be held in NOW accounts if the funds are held in trust pursuant to a program in which charitable organizations have the exclusive right to the interest earned. *See Phillips* at 159, 118 S.Ct. 1925 (citing Letter from Federal Reserve Board General Counsel Michael Bradfield to Donald Middlebrooks (Oct. 15, 1981)).

Article XI of the State Bar Rules of Texas provides that an attorney who receives funds that are "nominal in amount or are reasonably anticipated held for a short period of time" must place these funds in a separate interest-bearing NOW account that is denominated an IOLTA account. TEX. STATE BAR R., Art. XI, § 5(A); Tx. R. EQUAL ACCESS RULE 4, 7 (West 1999). Under the IOLTA rules, an attorney must initially determine whether the funds are capable of earning a net interest for the client. *Id.* RULE 6. In making this determination the attorney must decide if:

> such funds, considered without regard to funds of other clients which may be held by the attorney, law firm, or professional corporation, could not reasonably be expected to earn interest for the client or if the interest which might be earned on such funds is not likely to be sufficient to offset the cost of establishing and maintaining the account, service charges, accounting costs, and tax reporting costs which would be incurred in attempting to obtain the interest on such funds for the client.

*Id.*

The Internal Revenue Service does not attribute income earned in an IOLTA account to the individual client for federal income tax purposes so long as the client has no control over the decision whether to place the funds in the IOLTA account and does not designate who will receive the interest generated by the account. *See* Rev.Rul. 81–209, 1981–2, C.B. 16; Rev.Rul. 87–2, 1987–1 C.B. 18. Under the Internal

Revenue Code any interest from a non-IOLTA pooled account or sub-account must be reported separately. Rev.Rul. 87–2, 1987–1 C.B. 18.

The TEAJF is the designated beneficiary for the interest earned on the funds in the Texas IOLTA Program. The TEAJF is a non-profit organization established by the Supreme Court of Texas. TEX. STATE BAR. R., Art. XI, §§ 3, 4; Tx. R. EQUAL ACCESS RULE 9(a). The TEAJF distributes these funds to nonprofit organizations whose primary purpose is the delivery of legal services to low income individuals. Tx.R. EQUAL ACCESS RULE 10.

The parties to this litigation agree that the TEAJF does not enforce the portion of Rule 6 stating that an attorney must consider whether a client's funds can generate net interest "without regard to the funds of other clients." *Id.* RULE 6.

## III. Standing

Standing is a judicially-developed doctrine designed to ensure an Article III court is presented by parties before it with an actual case or controversy. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III").

To establish standing, a party must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* That injury must be "distinct and palpable and not abstract or conjectural or hypothetical." *Id.* (Internal quotes omitted). This injury requirement ensures that courts will decide only actual disputes and not abstract policy questions more properly decided by coordinate branches of government. *See, e.g., Allen v. Wright,* 468 U.S. 737, 746, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (stating that the law of Art. III standing is built on a single basic idea—the idea of separation of powers). Additionally, standing requires

courts to base decisions on a concrete, actual set of facts, so that a court may appropriately limit the precedential value of its decisions. *See Valley Forge Christian College v. Americans United for the Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

### A. To Whom Does the Money Belong?

On February 4, 1994 Plaintiffs brought suit against Defendants based upon a $1000 retainer Mr. Summers paid his attorney Mr. Mazzone and his firm Dow Cogburn & Friedman P.C., ("Dow Cogburn"). This money was paid in May of 1993 in connection with civil litigation filed against Mr. Summers and Glenloch Homes in 1992 [1]. Mr. Summers again paid a retainer of $250 to Mr. Mazzone in 1999 after this case was remanded by the Supreme Court.

■ Defendants argue that Mr. Summers does not have standing to bring this cause of action because the money placed in the Dow Cogburn IOLTA account did not belong to him, but to another entity, Abbey Enterprises. Defendants further assert that since this entity was a corporation, it could not earn interest on the $1000 retainer outside of IOLTA. Defendants assert that the Supreme Court holding that clients possess a property interest in the interest earned in an IOLTA account is based upon abstract principles of Texas property law and was not a factual determination that Mr. Summers possessed a property interest in the interest earned by the Dow Cogburn IOLTA account.

The evidence at trial established that the check with which Mr. Summers retained Mr. Mazzone in 1993 was not paid from his personal account, but from the account of a corporation, Abbey Enterprises. Transcript at 43. This money was placed under the client number for Glenloch Homes. Glenloch Homes was sued in conjunction with Mr. Summers, but was no longer in existence at the time the suit was

---

**1.** This case was dismissed in 1998 for want of prosecution. Transcript at 56.

filed. Transcript at 44, 111. The evidence established that Mr. Summers owned 60% of Abbey Enterprises and possessed the ability to write himself a check to pay his salary. Transcript at 114. Summers testified that he paid personal income taxes in 1993 on the $1000 he used to retain Mr. Mazzone. Transcript at 125. The evidence at trial further established that Abbey enterprises was not party to the litigation supported by the $1000 retainer.

Mr. Mazzone testified that four days prior to filing the instant suit in February of 1994, he instructed the bookkeeper at his firm to create a client number for Mr. Summers and to transfer the $1000 retainer from the Glenloch Homes client number to Mr. Summers' name. Transcript at 53, 84.

Plaintiff Summers maintains that this check, drawn on a corporate account was merely a distribution or salary payment to Mr. Summers and was treated as such on Abbey's books. Therefore, Plaintiffs argue that the money in issue was the property of Mr. Summers. Moreover, Plaintiffs argue that Summers paid Mr. Mazzone an additional retainer of $250 which Mr. Mazzone also placed in the Dow Cogburn IOLTA account. Transcript at 63. This check was written on Plaintiff's personal account. Plaintiffs' Trial Exhibits 13 and 14. Based on this, Plaintiffs assert that the ownership of the original retainer is irrelevant.

The Court finds that, for the purposes of this litigation, the $1000 retainer was the property of Mr. Summers sufficient to establish standing. *Heinrichs v. Evins Personnel Consultants, Inc., Number One,* 486 S.W.2d 935, 936 (1972). Moreover, even if the Court had not found that the $1000 is the property of Mr. Summers, it is clear the second retainer of $250 is Mr. Summers' personal property sufficient to support standing.

### B. Should the Money Ever Been Placed in IOLTA?

Defendants argue that the $1000 retainer paid on the Abbey Enterprises account never should have been placed in an IOLTA account in the first place. The Court finds that pursuant to IOLTA Rule 6 Mr. Mazzone properly determined at that time that the money would not generate net interest. Transcript at 46. Mr. Mazzone testified that he was unaware of the TEAJF policy of refunding interest on funds inadvertently placed in an IOLTA account until "recently." Transcript at 59. Mr. Mazzone further testified that he did not believe he had placed the $1000 in IOLTA by mistake. *Id.* The Court finds that pursuant to the Rules governing IOLTA at the time Mr. Mazzone placed Mr. Summers' retainer funds in the IOLTA account, Mr. Mazzone properly placed the money in his firm's IOLTA account. The Court further finds that Mr. Mazzone's determination that the $250 retainer should be placed in IOLTA is also proper.

### C. Mr. Summers' Bankruptcy

■ Defendants contend that due to a Chapter 7 bankruptcy filing, Mr. Summers cannot claim the benefit of the interest his funds allegedly earn in IOLTA. The testimony established that Mr. Summers filed for bankruptcy in June of 1999. Transcript at 61. The testimony further established that at this time, Mr. Summers owed the firm of Dow, Cogburn & Friedman in excess of $1000 in unpaid legal fees. Transcript at 119.

In light of Mr. Mazzone's continued representation of Mr. Summers, the Court finds that the retainer is still the property of Mr. Summers held in trust by Mr. Mazzone. Although Mr. Mazzone's failure to apply the $1000 retainer to an outstanding bill is somewhat unorthodox, his choice not to do so will not be questioned by this Court at this juncture. No evidence was submitted to this Court that any creditor of Mr. Summers laid claim to the $1000. Mr. Summers also testified that he informed the bankruptcy trustee of the exis-

tence of the $1000 retainer. Transcript at 120. Therefore, the Court finds that the nature of the ownership of $1000 retainer cannot be re-characterized by Mr. Summers' bankruptcy.

## IV. Failure to Join an Indispensable Party

### A. Special v. General Accounts

Defendants argue that this Court should reconsider the Supreme Court's determination that a client has a property interest earned on money placed in an IOLTA account. Defendants contend that the Supreme Court's decision was based on the assumption that the client owned the principal. Defendants contend that the Supreme Court "implicitly assumed" that IOLTA accounts are special in nature. In fact, Defendants assert, IOLTA accounts are general accounts, and the bank owns the principal instead of the client. *Texas Commerce Bank v. Townsend*, 786 S.W.2d 53 (Tex.App.—Austin 1990, writ denied).

In Texas, accounts are assumed to be general accounts unless the parties can establish that the account was a special account under an agreement with the bank that those particular deposits would be kept separate from the banks other funds. *Id.* There is no evidence that the parties at any time attempted to establish that the IOLTA account in issue was a special account.

■ In a special account, the depositor retains an interest in the specific principal placed on deposit. In a general account, all ownership rights in the principal are transferred to the financial institution and a debtor-creditor contractual relationship is established. *Hudnall v. Tyler Bank & Trust Co.*, 458 S.W.2d 183, 186 (Tex.1970).

■ Mr. Mazzone testified that the Dow Cogburn trust account was a general account. Transcript at 54. Mr. Mazzone further testified that he understood that in a general account his firm only had the contractual right to be repaid a sum equal to the original deposits in that account.

Transcript at 90. The Court finds that the Dow Cogburn IOLTA account is and was a general account.

The Court finds that the Supreme Court's finding was not based on an assumption that IOLTA accounts are special in nature. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), which the Supreme Court relied largely upon in coming to its determinations in *Phillips*, the account in issue was an interest-bearing general account and not a special account. In fact, in most cases a special account is not an interest-bearing account. *See* Testimony of Karen Neeley, Transcript at 363–64. As a matter of common sense, a bank would not pay interest on funds it could not use. Therefore an IOLTA account would not be feasible as a special account. The Court finds that Defendants' assertion that the Supreme Court assumed IOLTA accounts are special accounts is without merit. Therefore the Court declines to reconsider the property interest issue on this basis.

### B. Banks as Indispensable Parties

■ Defendants assert that in a general account Texas law states that the financial institution holds title to the funds deposited. *Paulsen et al v. Texas Equal Access to Justice Foundation*, 1999 WL 1078698, No. 03–98–00709–CV (Tex.App.—Austin, Dec. 2, 1999, n.w.h.). Therefore, based upon the legalism "interest follows principal" the banks in which Mr. Mazzone's law firm maintained it IOLTA accounts relevant to this cause of action—Chase Bank of Texas and Southwest Bank of Texas— hold title to the interest generated by IOLTA as well as the funds. Defendants request this Court to dismiss this cause of action pursuant to FED.R.CIV.P. 19(a)(1), for failure to include the banks as indispensible parties. The Court finds this argument must fail.

The Rule provides that a party is "necessary" and "shall be joined" if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). "A decision whether to dismiss must be made pragmatically, in the context of the substance of each case, rather than by procedural formula." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, n. 16, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

The Court finds, after carefully considering all the factors set forth in Rule 19(a), that Chase Bank of Texas and Southwest Bank of Texas are not necessary parties to this cause of action. First, in the absence of these parties, Plaintiffs can be afforded complete relief. They request injunctive relief only. An order enjoining TEAJF from applying the IOLTA program to Plaintiffs would provide them with complete relief.

In the alternative, failure to join these financial institutions would not "as a practical matter impair or impede the person's ability to protect" the banks' interest in IOLTA accounts. Mr. Mazzone contracted with these banks to pay the interest generated by his firm's IOLTA account to TEAJF. *See* Plaintiff's Exhibit 6, Affidavit of Professor Rounds. Certainly, a necessary change in this contractual relationship by the injunction of IOLTA will not impede the banks' interest. In fact, it might be in the banks' better interests to retain the interest on these accounts as they did pre-IOLTA. Lastly, failure to join the banks would not "leave any of the persons already parties subject to a sub-

stantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R.Civ.P. 19. Obviously, because Plaintiffs seek only declaratory and injunctive relief, failure to join these financial institutions would not leave the other Defendants open to multiple obligations. The Court finds that these financial institutions are not necessary parties to this litigation. Therefore, the Court denies Defendants' motion to dismiss on this basis.

## V. First Amendment

■ Plaintiffs allege that Texas' mandatory IOLTA program violates Plaintiffs' First Amendment rights by forcing them to finance speech they find objectionable. Plaintiffs originally asserted these claims before the district court in *Washington Legal Foundation v. Texas Equal Access to Justice Foundation*, 873 F.Supp. 1 (W.D.Tex.1995). In that opinion, this Court found that Plaintiffs' First Amendment claims "at least as far the client is concerned ... is necessarily predicated upon the Plaintiffs' claim that the funds generated by the IOLTA accounts are, in fact, the property of the client." *Id.* at 9. This Court further found that:

the IOLTA Program in no way compels any of the Plaintiffs to actually associate or otherwise be linked with the recipient organizations that they find repugnant (e.g. by becoming members or being publicly listed as benefactors). Because the Plaintiffs have failed to adequately allege any connection between themselves and the IOLTA recipient organizations, the Court finds that the Texas IOLTA Program does not unconstitutionally burden the Plaintiffs' First Amendment rights.

*Id.*

Neither the Fifth Circuit nor the Supreme Court directly addressed Plaintiffs' First Amendment challenge to IOLTA[2].

---

**2.** Plaintiffs assert that the Fifth Circuit's opinion that the grant of summary judgment was

reversed in its entirety and therefore Plaintiffs' First Amendment claims have been fully

However, to the extent that this court's earlier opinion is premised upon the finding that the interest generated by the IOLTA funds qualifies as "property" the Court revisits the First Amendment issue.

### A. Compelled Speech

Plaintiffs assert that the Texas IOLTA Program compels them to speak in violation of the First Amendment. The Supreme Court has acknowledged in two distinct lines of cases, two counterparts to the First Amendment's guarantee of free speech: the right not to speak, *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); and the right not to be compelled to subsidize others' speech, *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of Cal.*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). The first line of cases involves individuals being required to engage in involuntary affirmations of public belief. *See Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (displaying a government motto); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (pledging allegiance to the flag). The second line of cases involves compelled financial support of private organizations. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). Plaintiffs rely on these two lines of Supreme Court cases in support of their arguments.

### B. The Right Not to Speak

Defendants assert that a compelled speech cause of action requires a showing that the Plaintiff[3] will be identified with the message he finds objectionable and that Plaintiff cannot do so in the instant case. The Court finds that Defendants are correct with regard to the *West Virginia State Board of Education v. Barnette* line of cases. Plaintiffs agree that this line of cases requires that Plaintiffs show that they are being identified with the expressive activity to which they object. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 87–88, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

In *PruneYard*, the Supreme Court sustained a California law requiring the proprietors of shopping malls to allow visitors to solicit signatures on political petitions. The Supreme Court based that decision at least in part upon the fact that the solicitations would "not likely be identified with those of the owner," and that "no specific message is dictated by the State to be displayed on appellants' property." Moreover, the proprietors could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." *Id.* at 87, 100 S.Ct. 2035.

At trial Mr. Summers testified that he did not believe that the people of the State of Texas identified him with the causes funded by TEAJF with IOLTA funds. *See* Transcript at 116. The Court finds that no specific message is dictated by the variety of legal services that TEAJF funds with IOLTA dollars. Moreover, the Court finds Summers is free to publicly disassociate himself with the views of any IOLTA-funded litigation with which he disagrees. In fact, to a limited extent he has done so by filing this cause of action.

The relationship between Mr. Summers, Mr. Mazzone, IOLTA, the TEAJF, and the programs funded by the TEAJF with IOLTA funds is not easily traceable. Mr. Summers admitted that his money was placed in the Dow Cogburn IOLTA account long before he was aware of the existence of IOLTA, let alone the causes

revived. *See* Plaintiffs' Motion for Summary Judgment at 11.

3. Plaintiffs have abandoned their claim that Mr. Mazzone's First Amendment rights are being violated by mandatory participation in IOLTA. *See* Trial Transcript at 51.

funded by IOLTA. *See* Transcript at 51, 112. No evidence was submitted at trial of any identification of Mr. Summers with the programs funded with IOLTA monies. Therefore the Court finds that Summers has failed to establish that he is being identified with the expressive activities to which he objects and any claim premised upon this fails based upon the dictates of *PruneYard.*

### C. Compelled Financial Support

Plaintiffs are still free to assert that they prevail under the compelled financial support line of cases. *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of Cal.,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). Pursuant to these cases, Plaintiffs argue that the Texas IOLTA Program violates the First Amendment's prohibition on compelled speech by forcing Mr. Summers to financially support private organizations to which he objects. Plaintiff Summers objects on ideological grounds to the use of his funds to support IOLTA. *See* Transcript at 116.

Taken as a whole, the compelled contribution line of cases require a showing of three factors. First there must be an involuntary contribution. *Abood,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Second, the message supported by the involuntary contribution must be political or ideological. *Keller,* 496 U.S. 1, 9–17, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). Third, even when the message supported by the involuntary contribution is political or ideological, no First Amendment violation exists if the message supports the government's policy interests. *Id.*

 The Court notes that "the government does not, however, violate the First Amendment whenever it forces an individual to subsidize speech." *Hays County Guardian v. Supple,* 969 F.2d 111, 123 (5th Cir.1992). "Rather, the First Amendment prohibits the government from forcing an individual to contribute to the ideological expression of other private citizens for the

purpose of advancing those citizens ideological biases rather than substantial public interests." *Id.*

### 1. Compelled Involuntary Contribution

Defendants argue that Plaintiff Summers was not required to make an actual financial contribution, such as union dues, *Abood v. Detroit Board of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), or bar dues, *Keller,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), to the IOLTA Program. Defendants argue that therefore Plaintiffs cannot maintain the argument of compelled financial support. Defendants maintain that in this case, 'the client made no financial contribution at all. Defendants assert that without the IOLTA Program Plaintiff Summers' money would have gone into a non-IOLTA account with the interest benefitting only the bank.

Defendants further contend that Plaintiff Summers was not "compelled" to contribute to IOLTA because the client has already voluntarily relinquished all beneficial use of his money to the bank. *Prune-Yard Shopping Center v. Robins,* 447 U.S., 74 87–88, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Defendants assert that the State is not requiring the client to contribute anything that he has not already given up.

Plaintiffs argue that Mr. Summers' participation in IOLTA is not voluntary. They correctly assert that since Mr. Summers was not even aware of IOLTA for nearly a year following the placement of his funds in an IOLTA account, he could not have consented to participation. Transcript at 112. Defendants' assertion of voluntariness is premised on the fact that Mr. Summers willingly turned over the $1000.00 retainer to his attorney. Plaintiffs maintain that Defendants' assertion is incorrect as a matter of constitutional law. Plaintiffs assert that this case is akin to the finding that a state cannot condition employment in a government job on public support of a political party. The First Amendment is violated even though the

plaintiff may avoid the compelled speech by refusing to accept the proffered job. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

The issue of voluntariness in this case is highly related to this Court's findings regarding the ability of Mr. Summers' funds, placed in the Dow Cogburn IOLTA account, to generate interest that would equate to a measurable contribution. *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). For the sake of Plaintiffs' First Amendment claims, the Court will assume that Mr. Summers was required to involuntarily contribute to IOLTA.[4]

**2. Ideological or Political Activity**

Plaintiffs contend that the activities funded by TEAJF are ideological and/or political in nature. Plaintiffs assert that the advocacy of legal rights is by its very nature an inherently expressive activity and thus is subject to the compelled speech doctrine. *Lehnert v. Ferris Faculty Assoc.,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). Plaintiffs further argue that IOLTA funds have been expended to finance a lawsuit by a group of Democrats seeking to overturn the election results in Val Verde County, Texas[5] and to assist illegal aliens resisting deportation. Transcript at 211–212. Plaintiffs maintain that these are ideological and/or political activities to which Mr. Summers objects.

Defendants argue that the Texas IOLTA Program does not support a discernable message. Moreover, Defendants argue that a compelled contribution violates the First Amendment only where the "dissenter's objection rests on political or ideological disagreement with the content of the message." *Glickman v. Wileman*

*Bros. & Elliott,* 521 U.S. 457, 471, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997). Defendants argue that Mr. Summers has failed to identify the message propounded by the TEAJF with IOLTA funds, with which he disagrees.

At issue in this case is whether Plaintiff Summers objects to certain programs supported with IOLTA funds or whether he objects to the very existence of the IOLTA Program. The Court finds that Mr. Summers' objections to certain programs are a vehicle for his general objections to IOLTA. Mr. Summers does not object to the use of IOLTA funds because it creates a "crisis of conscience;" but rather, because he simply objects to the TEAJF's control over the IOLTA funds. *See Glickman v. Wileman Bros. & Elliott,* 521 U.S. 457, 471, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997). The concept of helping ensure equal access to the justice system for low income citizens is in itself a non-controversial idea, *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), and therefore does not qualify as a political or ideological activity. *Hays County Guardian v. Supple,* 969 F.2d 111 (5th Cir.1992). To the extent that Mr. Summers complains that the IOLTA Program is in itself expressive activity his claim fails. However, the Court finds that the TEAJF's activities in funding certain litigation could be ascribed certain political or ideological components and therefore potentially qualify as expressive activity against which Plaintiffs may lodge a First Amendment claim. The Court finds that Plaintiffs' First Amendment claims nevertheless fail.

**3. Core Government Function**

Defendants assert that the Texas IOLTA Program supports a core govern-

4. The Court notes the Defendants' contention that an attorney and client may both avoid placing funds in IOLTA by "creative" structuring of the financial relationship. Mr. Mazzone required that Mr. Summers pay a retainer but he could have chosen an alternative form of payment.

5. The TEAJF submits that no IOLTA funds were earmarked for this litigation and that TEAJF restricts the use of IOLTA money through the terms of the grant.

ment function by providing access to the Texas justice system.

In *Abood*, the Supreme Court addressed the First Amendment claims of dissenting employees subject to an "agency-shop" agreement between their government and a union. The agreement required each employee to pay the union a "service fee" equal to the dues required of union members, but limited no one's right to speak separately and obliged no employee to join the union, personally espouse unionism, or participate in the union in any other way. *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). The Supreme Court found in that case that the union's use of the dissenter's service fees for expressive purposes unrelated to collective bargaining violated the First Amendment rights of those employees. *Abood* struck down the service fee because it funded the union's expression of support for "ideological causes not germane to its duties as collective bargaining representative." *Id.* at 235, 97 S.Ct. 1782.

In *Glickman v. Wileman Brothers & Elliott, Inc.*, the Supreme Court solidified its holding in *Abood* and stated that:

> the Court reads *Abood* for the proposition that the First Amendment places no limits on government's power to force one individual to pay for another's speech, except when the speech in question is ideological or political in character and is not germane to an otherwise lawful regulatory program.

521 U.S. 457, 471–472, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997).

Therefore, the question now before the Court is whether the IOLTA Program itself and the expressive activity that Mr.

Summers objects to the TEAJF funding are germane to an otherwise lawful regulatory program and support a substantial public interest—that of supplying legal services to the poor. *Hays County Guardian v. Supple*, 969 F.2d 111 (5th Cir.1992). The Court finds that the compelled contribution of Plaintiff's funds to IOLTA accomplishes and is germane to the "government's vital policy interest" of making legal services accessible to all. *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). "Improving the quality of legal services" is an important state interest. *Keller v. State Bar of Cal.*, 496 U.S. 1, 7, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (citing *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961)). Plaintiffs have failed to identify any instance where TEAJF funds were used in a manner not consistent with providing access to legal services. Unlike in *Keller*, the TEAJF has not used IOLTA funds to lobby or in an attempt to legislate. The Court finds that compelled funding of IOLTA does not "significantly add to the burdening of free speech." *Lehnert*, 500 U.S. at 521, 111 S.Ct. 1950. Moreover, "[t]he reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is the representative of the people" *See Abood*, 431 U.S. at 259, n. 13, 97 S.Ct. 1782 (Powell, J., concurring in judgment).

The sole purpose of the TEAJF is to fund legal services for the poor. Its activities in funding various programs are germane to this government interest. Based on the foregoing, the Court finds that Plaintiffs' First Amendment claims must fail.[6]

---

6. The Court is prepared to determine if the IOLTA program is narrowly tailored to the compelling state interest of making legal services accessible to all citizens. However, the parties seem to have abandoned any claims of this nature. *See* Parties' Agreed Pre–Trial Order. The Court finds that IOLTA is a content neutral program. *See* Plaintiffs' Motion for Summary Judgment at 17. Therefore an in-

termediate level of scrutiny is applicable. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In this case, it seems clear that IOLTA furthers an important government interest, unrelated to the suppression of free speech, and the incidental burdens on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* The government's

## VI. Fifth Amendment

Having addressed Plaintiffs' First Amendment claims, the Court now turns to the central issue in this case—whether or not a taking occurred pursuant to the Fifth Amendment and if so, what is the just compensation for that taking.

The Fifth Amendment provides that "private property" shall not be "taken for public use without just compensation." U.S. CONST., amend. V. To prove an unconstitutional taking, Plaintiffs must first establish that a cognizable property right exists in the thing taken—in this case the interest earned on client funds placed in IOLTA accounts. *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The United States Supreme Court determined that the interest income held in IOLTA accounts is the "private property" of the owner of the principal. The Court stated:

> We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amounts of "just compensation," if any, due respondents. We leave these issues to be addressed on remand.

*Phillips v. Washington Legal Foundation*, 524 U.S. 156, 118 S.Ct. 1925, 1934, 141 L.Ed.2d 174 (1998). Thus the Court must address these issues on remand.

The parties to this cause of action have stipulated, and the United States Supreme Court has recognized, that during the period of this litigation, from 1994 to the present, Texas lawyers were permitted under the IOLTA rules to pool client trust funds into a single account; either a IOLTA or non-IOLTA savings or NOW account that generated net interest for clients. *See* Pre-trial Order at 7.

■ "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."

interest in making legal services accessible would be achieved less effectively absent the existence of IOLTA. *Ward v. Rock Against*

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The Court addresses the issue of just compensation first.

### A. Just Compensation

■ Regardless of the Court's determination of whether a taking occurred, the crux of this case rests on the issue of just compensation. "As its language indicates, and as the Court has frequently noted, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314–315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Of all the terms used in the Takings Clause, "just compensation" has the strictest meaning. The Fifth Amendment does not allow simply an approximate compensation but requires "a full and perfect equivalent for the property taken." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893).

■ In determining just compensation, "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725 (1910). The government is not obligated to compensate a property owner for a "loss of theoretical creation, suffered by no one in fact." *Id.* at 194, 30 S.Ct. 459. "Just compensation" generally means "the full monetary equivalent of the property taken." *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970).

*Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

at 194. In determining the amount of just compensation for a taking, a court seeks to place a claimant "in as good a position pecuniarily as if his property had not been taken." *United States v. 564.54 Acres Land,* 441 U.S. 506, 510, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). The Court must calculate any loss objectively and independently of the claimant's subjective valuation. *See, e.g., Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

■ The factual issue before the Court in deciding what award would be needed to place Mr. Summers in as good a position as he would have enjoyed without the alleged taking, is what is the monetary amount of the net interest or net benefit lost by Mr. Summers because his funds were placed in IOLTA. The Court will measure any required compensation by Mr. Summers' loss, not by the government's gain, or in this case the gain enjoyed by the recipients of TEAJF funding.

Plaintiffs argue that the value taken in this case is easily ascertainable. Whatever the amount of interest earned by Mr. Summers' monies, regardless of expenses incurred to generate the interest, is the amount of Mr. Summers' just compensation. Mr. Summers testified at trial that he was no worse off because of IOLTA. Transcript at 136. Additionally, this evaluation would only be appropriate if the Court applies a per se analysis, which the Court declines to do.

Plaintiffs assert in this case that although a client's money placed in an IOLTA account cannot garner net interest without IOLTA it could still tally a net benefit to the client. Plaintiffs assert that the costs that a lawyer must consider when placing funds in her IOLTA account are incorrectly distributed. In determining whether to place funds in an IOLTA account a lawyer is asked to consider internal costs: the expense of the attorney's or law firm's staff time in establishing a

separate account; the expense of preparing and filing IRS forms, (1099's); the bookkeeping and accounting expenses for tracking the account; the monthly reconciliation of the account for the client; and, the closing of the account at the bank and remitting the funds to the client. A lawyer is also directed to consider the following external costs: the minimum balance at the bank at which the account is placed; the service charges, if any, assessed against the account by the bank; and other additional fees that the bank may have for investment policies. *See* Defendants' Exhibit 1.

Plaintiffs argue that the internal costs are costs the lawyer or firm will incur regardless of whether the funds are placed in an IOLTA or non-IOLTA account. Plaintiffs argue that client funds can generate a net benefit to the client when not placed in IOLTA. The Court finds that the testimony at trial established otherwise. There are innate costs to the firm or lawyer in a non-IOLTA account that differ from those in an IOLTA account. The Court carefully considered the various evidence presented at trial regarding in-firm pooling, sub-accounting, and the net benefit theory. In light of the evidence before the Court, the Court finds that Mr. Summers did not suffer a compensable loss.

### 1. In–Firm Pooling

Plaintiffs offered the testimony of Robert Randell at trial. Mr. Randell is an attorney in New York who has established an in-firm pooling method for his own solo practice. Mr. Randell testified that he possesses a computerized system of linked ledger sheets that makes in-firm pooling inexpensive to the lawyer and beneficial to clients. Mr. Randell testified that he places all escrow deposits in a money market account. This includes corporate funds which cannot be placed in a NOW account unless the interest is paid to a charitable organization. Mr. Randell makes no initial determination whether the

money is capable of earning net interest on its own, but places all client monies in the same fund. *See* Transcript 142–154. Plaintiffs offered Exhibit 24 which shows two accounts belonging to Mr. Randell's clients. This evidence illustrates Mr. Randell's method of calculating interest and fees. Mr. Randell testified that after the bank notifies him of the interest earned on the account, he apportions the interest to each client. He then charges an administrative fee which is about one-half of the interest earned, or in his characterization, one percent of the client's interest plus principal. Mr. Randell testified that he rarely has the funds of more than six clients in his account. He also testified that in his own practice there are times when he does not place client funds in an interest-bearing account because it is too little money or for too short a period of time to gain a net benefit for the client.

The Court finds that Texas lawyers can make benefit of this process if it earns net interest for the clients. In fact, to do so is mandated by IOLTA. Tx. R. Equal Access Rule 4B (West 1999). However, the funds described in Mr. Randell's in-firm pooling scenario are funds that in most cases would earn a net benefit for the client without in-firm pooling. Moreover, Mr. Randell's allocation of the administrative fee by percentage of the client's money changes the ultimate determination of net interest. Seemingly, the administrative costs of allocating $2000 should not be less than those for the of allocation $200,000. In Mr. Randell's scheme, the larger dollar amounts in his "pool" in effect pay the costs for the smaller amounts and allow those smaller amounts to earn interest. There may be net interest on the smaller accounts but only at a loss to the larger. This system would only affect a small percentage of money that otherwise would be placed in IOLTA and fails to address small amounts of money held for short periods of time that could not earn interest at all. Mr. Randell's unique situation, where he deals with a small number of transactions, larger amounts of money, and over lengthy time periods is not illustrative for purposes of any determination regarding IOLTA. IOLTA requires the attorney to make an initial determination of whether the client funds can earn net interest. In cases where the funds can earn net interest, the attorney is to place the funds in an appropriate financial product. Only in such cases would Mr. Randell's in-firm pooling arrangement be feasible. Even in these cases, Mr. Randell is subsuming the bank's role in an effort to generate an added administrative fee for his practice, albeit with the agreement of his clients. Added to this, Mr. Randell must prepare the 1099 forms for each client earning in excess of $10 in interest. Moreover, Mr. Randell's system is not a demand account as mandated by the rules of ethics. Tex. Disciplinary R. Prof. Conduct 1.14, *reprinted in* Tex. Gov't Code Ann., tit 2, subtit. G app. A (Vernon's Supp.1998) (Tex. State Bar R. Art. X, § 9). The Court finds that Plaintiffs have failed to establish that Mr. Summers' monies could earn net interest if placed in an in-firm pooled account.

### 2. Sub-accounting[7]

Plaintiffs offered evidence at trial in an effort to establish that client monies could earn net interest through sub-accounting practices. Sub-accounting is a banking product where an entity such as a law firm opens a master account in its name and a linked sub-account for each client for whom the firm is holding funds. Defendants' Exhibits 42 and 43. These sub-accounts are interest bearing accounts

---

7. The parties presented a multiplicity of evidence at trial in an effort to determine whether sub-accounting is in fact available in Texas. The Court finds that at this point in time sub-accounting is not available in Texas. *See* Testimony of Karen Neeley and Frank Newton. However, a lawyer could in theory, and with his client's agreement, open a sub-account outside of Texas. *See* Transcript at 209. Nevertheless, the Court finds that this issue is irrelevant to this cause of action.

with the interest rate aligned with that earned in a money market account. In the Chase Client Funds Account, which Plaintiffs offer as an example of the service, the bank provides a monthly report to the attorney or firm tracking every disbursement, and interest earned in each sub-account. The bank also prepares IRS 1099 forms at the end of the year for each sub-account. Chase advertises this product as "specifically suited to high balance, low activity, escrow funds management." The monthly fee is $21.00 if the balance is below $5,000; $15 if the balance is between $5000 and $14,999; and $10 if the balance is between $15,000 and $39,999. Additionally, the bank charges activity fees for almost all transactions. These fees vary from $.20 for a deposited check to $25.00 for a daily report by fax on five accounts. The evidence establishes that the Citibank sub-accounting product charges similar fees, but that Citibank offers a no fee business account as long as the average balance exceeds $1000. However, it is not clear from the evidence offered at trial the terms and conditions of this particular type of account.

Mr. Randell testified as to the availability of bank sub-accounting products in the state of New York. *See* Plaintiffs' Exhibits 21, 22, and 23. These exhibits are advertisements demonstrating the availability sub-accounting products in New York by Chase and Citibank. None of these advertisements discuss the costs of sub-accounting products. Mr. Randell further testified that nothing in the IOLTA rules prohibits the use of bank sub-accounting products. Transcript at 179. On cross-examination, Mr. Randell testified that with regard to the sub-accounting products offered by Chase, if the client account is zero for ten consecutive days, the account would be closed and the interest forfeited. Transcript at 184; Defendants' Exhibit 42, Terms and Conditions for Business Accounts and Services at 16.

A lawyer using this product is limited to three withdrawals by check per month and may make an additional three transfers by telephone, computer, pre-authorized third party payments, and pre-authorized transfers to another account. Transactions exceeding these limits are charged banking fees. There is no limit on the number of withdrawals or transfers made; in-person, by mail, by messenger, or at an ATM.

Claude Ducloux, a solo practitioner from Austin Texas, testified about the operation of his IOLTA account. Mr. Ducloux testified to the following: that IOLTA costs to an individual attorney operating an IOLTA account are zero, *see* Transcript at 269–270; that on average he keeps the funds of 20–30 clients in his account in the amount of $20,000 to $30,000; that he keeps most of the client funds in the account for 30 to 60 days and garners an interest rate of 72 hundredths of one percent, Transcript at 272; that his IOLTA account earns less than $15 in interest per month; that transactional fees and internal costs in his own time. would make apportioning this $15 interest among his 25 clients a net loss; that in the month of August 1999 he had a net interest of $10 on the $32,000 in his non-IOLTA firm account and bank charges of $12.

Ducloux also testified to the following: that for sub-accounting to be feasible for his use the product would have to be free and that would not take into account his time spent reconciling the account; that included in his expenses of allocating interest would be determining the date the check clears, the interest rate, deductions for any transactions using the client money, and recalculations of interest, Transcript at 277; that if in-firm pooling software were available he would still have the costs of buying the software and inputting the data; and that it requires five minutes for him to reconcile his IOLTA account each month.

Plaintiffs assert that reconciliations like Mr. Ducloux's still have a cost and that cost is passed on to the client. Dean Frank Newton testified that many Texas firms do not consider their own overhead

when determining whether to place funds in IOLTA. Transcript at 223. Therefore some funds are not placed in IOLTA that theoretically should be placed in IOLTA under the rules. Dean Newton also testified that prior to the institution of IOLTA, these same funds did not earn interest. Transcript at 217.

Karen Neeley, general counsel for the Independent Bankers' Association of Texas testified that banks in Texas are not offering sub-accounting because such products are too expensive for the banks. Transcript at 331. Ms. Neeley testified to the following: that it is time consuming for banks to set up each sub-account; that bank charges are generally on the increase, Transcript at 336; that in her opinion, in many cases the use of sub-accounting would result in a net of less than zero, Transcript at 343; and that the termination of the IOLTA program would not result in the advent of sub-accounting availability in Texas, but the pre–1984 status quo where lawyers' trust accounts earned no interest.

Ms. Neeley also testified to the following: that a demand account may not offer interest; that a NOW account and a savings account are not demand accounts, Transcript at 360; and that many banks waive fees for IOLTA accounts, but that some banks still charge these fees. Transcript at 362.

Mr. Bruce Buell, a solo practitioner from Colorado with a specialization in banking and trust and estate law testified that after NOW accounts were authorized in 1980, the IRS ruled that if interest earned on NOW accounts went to IOLTA there was no tax liability for individual clients. This was because the client had no authority to determine where the money was allocated.

Mr. Buell also testified that under the current IOLTA program attorneys can place client monies that they determine cannot earn net interest in an IOLTA account or, if the attorney determines that the client's money can earn net interest, in a separate NOW account, separate savings account, in-firm pooling, or sub-account. Transcript at 384–86.

Mr. Buell also testified to the following: that in his opinion, sub-accounting is appropriate only for higher balance accounts with less activity, Transcript at 389; that IOLTA accounts are cheaper in bank service charges and cost less in attorney time than non-IOLTA accounts, Transcript at 401; that in IOLTA accounts, the TEAJF pays the service and maintenance fees so there is no charge to the attorney, Transcript at 397; that generally banks do not require minimum balances on IOLTA accounts, there are no restrictions on transfers or withdrawals, and that there is one monthly reconciliation, Transcript at 398; that sub-accounts will have maintenance and service fees, minimum balances, restrictions on transfers and withdrawals, and monthly reconciliations for the master account and each sub-account; that the man-hour time in reconciling the accounts as well as tracking transfers would be significant, Transcript at 399; and that separate accounts for each client would be more expensive that sub-accounts, but that the costs in man hours for the attorney would be similar. Transcript at 400.

Lastly, Mr. Buell testified that the costs to the lawyer of maintaining a sub-account are much greater than those of maintaining an IOLTA account. Therefore, the costs of maintaining an IOLTA account are not passed to the clients, while the costs or maintaining a sub-account would. Transcript at 418. Moreover, Mr. Buell testified that since the TEAJF bears the costs of maintaining IOLTA accounts, these accounts are less expensive to administer than other alternatives. Transcript at 396.

The Court finds that the costs of sub-accounting in lawyer and staff hours and in addition to bank charges exceed the costs of IOLTA. These costs make net interest to clients infeasible except in cases where large sums of money are held or when client funds are held for long periods of

time. In these cases, the client funds would not be placed in IOLTA. Therefore, the Court finds that Plaintiffs' have failed to establish through the evidence before the Court that Mr. Summers' funds could theoretically earn net interest in a sub-account.

### 3. Net Benefit Theory

Plaintiffs offer the theory that even if Plaintiffs' money cannot generate net interest for the client, the money can attain a net benefit for the client. This theory is difficult to fathom, but in a nutshell is that by decreasing the lawyer's costs through use of the client's money, the client will benefit. Although this may be true to an extent, this option is generally foreclosed by Cannon 11 of the Canon of Professional ethics, *See* Plaintiff's Exhibit 16, and specifically by the applicable ethical rules.

Canon 11 provides:

A lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client. Money of the client or collected for the client or other trust property coming into possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him.

Texas State Bar Rule of Professional Conduct 1.14 provides:

(a) A lawyer shall hold funds and other property belonging in whole or in part to clients or third persons that are in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account, designated as a "trust" or "escrow" account, maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other client property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of [five years] after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

TEX. DISCIPLINARY R. PROF. CONDUCT 1.14, *reprinted in* TEX. GOV'T CODE ANN., tit 2, subtit. G app. A (Vernon's Supp.1998) (TEX. STATE BAR R. ART. X, § 9). The Comment to this Rule reads:

A lawyer should hold property of others with the care required of a professional fiduciary.... All property which is the property of clients or third persons should be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts....

The obligations of a lawyer under this Rule are independent of those arising from activity other than rendering legal services. For example, a lawyer who serves as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction.

*Id.* The Court finds that allowing attorneys to benefit from their clients' trust accounts, even if they pass this benefit on to clients, would qualify as an ethical violation. Therefore, the Court must discount Plaintiffs' argument regarding net benefit.

More importantly, the Court finds that Plaintiffs' arguments about "net benefit" and theoretical costs are made somewhat in a vacuum. Plaintiff's have failed to present any evidence that Mr. Summers' money, either the $1000 or the $250, did

and could generate net benefit or net interest if not for IOLTA. Plaintiffs failed to establish an actual number denominating Mr. Summers' loss. With regard to *this case* and *Mr. Summers'* monies, Plaintiffs have failed to carry their burden of proof. Although this case turns on endless abstractions and near impossible mathematical conclusions it is without doubt that at a minimum Plaintiffs must present evidence to this Court that Mr. Summers is materially worse off because of IOLTA. At trial Mr. Summers testified that he is no worse off because of IOLTA. Transcript at 136.

The main source of net interest derived from IOLTA is generated by corporate and partnership monies which are disallowed from earning interest by federal banking law. Mr. Summers' money, since this Court has determined that it indeed belongs to him, is not the type of money from which IOLTA derives a great benefit. In fact, it is entirely possible, that Mr. Summers' money, placed in an IOLTA account, derived a negative benefit to IOLTA. *See* Testimony of Frank Newton at Transcript 225 (stating that 46–47% of IOLTA accounts cause TEAJF to lose money and that TEAJF pays negative fees). Plaintiffs fail to challenge 12 U.S.C. § 1832(a) and 12 C.F.R. § 204.130 (1997), which without a doubt, make possible and provide the greatest source of income for IOLTA.

The Court finds, based upon the evidence before the Court regarding in-firm pooling and sub-accounting, that without IOLTA the interest generated by Mr. Summers' principal would possess no economically realizable value. Plaintiffs have failed to present evidence of a loss. The Court finds that, based upon all the evidence before it, Mr. Summers's loss is zero. The Court finds that with regard to the Plaintiffs' net benefit theory, Plaintiff's loss is also nothing. Even if the Court accepted Plaintiffs' theory, Plaintiffs failed to establish how and in what amount this "net benefit" would be passed on to clients. Without an identifiable compensable loss, the Court finds there has been no taking without compensation in violation of the Fifth Amendment.[8] Accordingly Plaintiffs' Fifth Amendment claims fail. However, as directed by the Supreme Court and the Fifth Circuit Court of Appeals, this Court will go on to address the related issue of whether a taking has occurred.

### B. Has a Taking Occurred?

#### 1. Per Se Analysis v. Ad Hoc Analysis

The United States Supreme Court has distinguished two general categories of takings: per se takings and regulatory takings. Government action that deprives property owners of all productive use of their property or physically invades property boundaries is often determined to be a per se or categorical taking. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). If a government regulation is not considered a per se taking, this Court must still consider whether a regulatory taking has occurred by considering three different factors: 1) the severity of the economic impact on the takings claimant; 2) the extent to which the regulation interferes with investment-backed expectations; and 3) the character and benefits of the government regulation. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The panel's opinion in the instant case gave no explicit indication whether the court viewed the case as a regulatory or per se takings case. *Washington Legal Foundation v. Texas Equal Access to Justice Foundation,* 106 F.3d 640, 645 (5th

---

**8.** Although the Plaintiffs are only requesting declaratory and injunctive relief, they must still prove that a taking occurred "without just compensation" in order to establish a violation of the Fifth Amendment, which is a prerequisite to relief. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314–315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

Cir.1997) (Benavides, J., dissenting from decision to failure to grant rehearing en banc). Thus, this Court must determine whether to apply a per se or regulatory analysis with limited guidance from the higher courts.

Plaintiffs argue that a per se takings analysis is applicable when the government invades or appropriates private property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). Plaintiffs further maintain that a per se analysis is appropriate when, as in this case, the property in issue is money. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). Plaintiffs also assert a related argument that a per se taking has occurred because Plaintiff has lost the right to exclude others from making beneficial use of his property.

Defendants maintain that per se analysis is inappropriate in this case and that the "ad hoc, factual" takings inquiry set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), should apply. Defendants assert that *Loretto* and *Kaiser Aetna* relate to the permanent physical invasion of real property. They further argue that appropriation of money does not qualify as a physical appropriation of property since money is fungible, "unlike real or personal property." *United States v. Sperry*, 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989).

Defendants further contend that the Supreme Court did not apply a per se takings analysis in *Webb's Fabulous Pharmacies* and that the balancing of interests in that case was inconsistent with a per se takings analysis. Defendants argue that the takings claims succeeded in *Webb's* not because the Court applied a per se test, but

because the state offered no reasonable basis to support the monetary analysis.

The Court finds that Defendants are correct and that *Loretto, Lucas,* and *Kaiser Aetna* all differ from this case because those cases involve the physical invasion of real property. The Court finds that Plaintiff's related right to exclusion claim fails because the cases he relies on for that proposition all deal with real property, and this case deals with money, which is fungible. *Sperry*, at 62 n. 9, 110 S.Ct. 387. Therefore, Plaintiffs cannot rely on the real property cases to establish that a per se analysis is applicable here. However, Plaintiffs assert that this differentiation between cases where a per se analysis is applied from those in which an ad hoc analysis is applied, fails to explain the Supreme Court's holding in *Webb's Fabulous Pharmacies*[9]. Plaintiffs assert that *Webb's* did not involve real property and yet the Court applied a per se analysis. This Court begins with analysis of *Webb's*, since the Supreme Court relied on that case in determining that Plaintiffs possess a property interest in the interest generated by funds placed in IOLTA accounts. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 118 S.Ct. 1925, 1934, 141 L.Ed.2d 174 (1998).

In *Webb's*, the Supreme Court found that a Florida statute, allowing a Florida county to take the interest generated by an interpleader fund as its own, when that county charged a separate fee for the clerk's services in receiving the fund into the registry, was violative of the Fifth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 156, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). The appellant in that case filed an interpleader action in Florida state court and tendered the sum at issue, nearly $2 million, to the court. In addition to deducting $9,228.74 from the interpleader fund as a fee "for services rendered," the clerk of court also retained the more than $100,000 in interest income generated by the deposited funds.

9. *Webb's* was decided before the Supreme Court articulated the per se test.

*Id.* at 157, 101 S.Ct. 446. The Supreme Court held that the statute authorizing the clerk to confiscate the earned interest violated the Takings Clause. *Id.* at 164, 101 S.Ct. 446. The Supreme Court stated, "a State by ipse dixit, may not transform private property into public property without compensation" simply by legislatively abrogating the traditional rule that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." *Id.* The Court distinguished "confiscatory regulations" from "those regulating the use of property" and stated that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." *See id.,* at 163–164, 101 S.Ct. 446; *see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

In this case, the Court finds IOLTA does not qualify as a confiscatory regulation of Mr. Summers' property. Distinguishable from *Webb's,* the instant case is one where the client's money cannot be placed in an IOLTA fund unless it cannot earn interest elsewhere. Tx. R. Equal Access Rule 4B, 6 (West 1999). In *Webb's,* there was net interest in issue. *Webb's* at 163, 101 S.Ct. 446. Net interest could have been earned on that money regardless of whether it was interpleaded into the court or held in a private bank account. In this case the legislative and regulatory framework makes net interest impossible outside of the context of IOLTA; but for IOLTA, the money necessarily would lie fallow.

The monetary interest at issue in *Webb's* arose out of the operation of a specific, separately identifiable fund of money, from which the government collected a fee. *See*

*Eastern v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2134, 141 L.Ed.2d 451 (1998). In *Webb's* net interest was extant even after the applicable fees were subtracted from the principal. In this case, the costs of generating interest exceed the interest a client could earn, or by definition the funds would not be placed in IOLTA. On this basis the instant case is easily distinguishable from *Webb's.* In the instant case there is no money to confiscate outside the mechanisms which make IOLTA possible, therefore it cannot qualify as a confiscatory taking.[10] *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

The Supreme Court stated in *Phillips,* "[a]s to the principal, then the IOLTA rules at most 'regulate the use of the property'" *Phillips,* 118 S.Ct. at 1930 (citing *Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992)). The Court finds that this case is one in which the interference with property cannot be characterized as a physical invasion by the government. Plaintiffs claimed interference clearly stems from "some program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central,* 438 U.S. at 116–118, 98 S.Ct. 2646. Therefore, the Court finds that the ad hoc analysis consistent with a claims of a regulatory taking is applicable.

Government regulation often "curtails some potential for the use or economic exploitation of private property," *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

---

10. The test the Court applied in *Webb's,* arguably the case most on point with the instant case, seems to fall somewhere in between a per se and regulatory ad hoc analysis. Plaintiffs seemingly acknowledge this and offer a new, three-prong test for this Court to apply. The Court declines to do so. The articulation of a new test in the area of takings law is a

task better left to a higher Court. However, the Court could find that even applying a hybrid test Plaintiff's claims would fail. The exaction in this case does not go to general government revenues, but is earmarked to legal services and this cost is reasonably related to the costs of using a lawyer.

"In light of that understanding, the process for evaluating a regulation's constitutionality involves an examination of the "justice and fairness" of the governmental action." *Eastern Enterprises v. Apfel,* 118 S.Ct. at 2146. "That inquiry, by its nature, does not lend itself to any set formula." *Id.* The determination is essentially ad hoc and fact intensive. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The Supreme Court has identified several factors that have particular significance: "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646.

### 2. *Applying the Ad Hoc Analysis*

■■■ The Court now considers: 1) the economic impact of the regulation; 2) the extent of interference with "distinct investment backed expectations"; and 3) the nature of the governmental action. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Defendants argue that at most, the Texas IOLTA Program has no impact on the client principal or interest. Defendants argue that since the client could not have earned net interest absent IOLTA, there is no economic impact on the client, Mr. Summers. Plaintiffs assert that the economic impact factor tips in their favor, because IOLTA expropriates 100% of the interest earned on IOLTA. The Court finds that the costs of administering the money placed in a non-IOLTA account exceed those in an IOLTA account. These costs would subsume the interest earned if not for IOLTA. The client's funds would be unable to generate net interest absent IOLTA. Therefore the economic impact of the regulation on Plaintiffs is nill. Moreover, in the absence of IOLTA, the money would necessarily generate no interest for anyone but the banks. *See* 12 U.S.C. § 1832(a); *see also* TEX. DISCIPLINARY R. PROF. CONDUCT 1.14(b), *reprinted in* TEX. GOV'T CODE ANN., tit 2, subtit. G app. A (Vernon's Supp.1998) (TEX. STATE BAR R. ART. X, § 9).

Defendants further argue that Plaintiffs have no reasonable, investment-backed expectation in the interest earned on principal placed in IOLTA. This is because, Defendants argue, if the Plaintiffs' funds could earn interest outside of IOLTA the funds should not be placed in IOLTA. Therefore any expectation of interest could only be created by IOLTA itself and would disappear without IOLTA. However, Plaintiffs note in *Webb's* that the Court found a compensable taking had occurred despite the fact that the parties in that case had no right to insist that the court holding the interpleaded funds invest the money. The Court found that, once the funds were invested, the owner of the principal owned the interest. Once again, this Court distinguishes *Webb's* based on the fact that net interest was in issue that could have been earned regardless of whether the funds were held by the court or by the owner. In this case, Plaintiffs cannot hold a legitimate investment-backed expectation of interest when funds placed in IOLTA cannot by definition earn net interest.

Defendants further assert that IOLTA is a beneficial government program which by regulation transfers the benefit (the "use value") of funds unable to earn interest outside of IOLTA from banks to TEAJF in order to provide legal services to the poor. Plaintiffs respond that the character of the government action, in this case the expropriation of money, suggest that the IOLTA program constitutes a compensable taking. Plaintiffs argue that they have been unfairly singled out by the government to bear a burden they had no role in creating. *Eastern Enterprises v. Apfel,* 524 U.S. at 520, 118 S.Ct. 2131.

Plaintiffs in the instant action cannot maintain they are being unfairly singled out to bear a burden, when they are in fact bearing no burden at all. The IOLTA program costs Plaintiffs nothing. The governmental action in this case does not implicate fundamental principles of "jus-

tice and fairness" because there is no cost to Plaintiffs. *Id.*

Employing an ad hoc analysis, and applying the fundamental principles of justice and fairness the Court finds that a taking has not occurred. The IOLTA Program is not in any way unfair to Plaintiffs. "It cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Therefore, Plaintiffs' Fifth Amendment claims fail on this additional basis.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that all Plaintiffs' claims against all Defendants in this cause of action are hereby DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that this cause of action is CLOSED and that all pending motions are hereby DENIED AS MOOT.