Edward B. GRAY, Individually and on behalf of all others similarly situated,

v.

Blair LEE, III, Individually and in his official capacity as Acting Governor of the State of Maryland,

and

Robert J. Lally, Individually and in his official capacity as Secretary of the Department of Public Safety and Correctional Services,

and

Mark A. Levine, Individually and in his official capacity as Commissioner of the Division of Correction of the Department of Public Safety and Correctional Services,

and

Ralph L. Williams, Individually and in his official capacity as Warden of the Maryland House of Correction,

and

William S. James, Individually and in his official capacity as Treasurer of the State of Maryland.

Civ. A. No. B–74–1148.

United States District Court, D. Maryland.

Jan. 28, 1980.

Robert B. Levin, Baltimore, Md., for plaintiff.

Stephen H. Sachs, Atty. Gen. of Md., Stephen Rosenbaum, Asst. Atty. Gen. of Md., Baltimore, Md., for defendants.

## MEMORANDUM

C. STANLEY BLAIR, District Judge.

This is a class action pursuant to Fed.R. Civ.P. 23(a) and 23(b)(2) brought by Edward B. Gray, an inmate currently incarcerated in the Maryland House of Correction[1], on behalf of all persons presently incarcerated in Maryland state penal institutions who are subject to the regulations of the Division of Correction of the Department of Public Safety and Correctional Services which govern the treatment of inmate funds and finances. The plaintiff class bases its claim upon the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction based upon 28 U.S.C. § 1343(3).

Edward Gray, the representative of the plaintiff class, filed the subject action on October 18, 1974, alleging several constitutional violations arising out of his commitment to the Maryland penal system. In particular, Mr. Gray alleged that the Division of Correction regulations which require an inmate to surrender his or her money to the penal institution so that such funds could be placed in a non-interest bearing account for the benefit of that inmate are unconstitutional. In addition, Gray alleged that conditions at the Maryland House of Correction were such as to constitute cruel and unusual punishment.[2] On November 7, 1974, the defendants responded to Mr. Gray's complaint by filing a Motion to Dismiss (See Paper No. 7) and Mr. Gray, in turn, responded by filing numerous documents with the Court, some of which raised new allegations while others were of ques-

1. On March 8, 1976, the plaintiff informed the Court he had been transferred to the Maryland Correctional Camp Center in Jessup, Maryland, but in September of that year he filed a self-styled "writ of habeas corpus" claiming that officials at the Maryland House of Correction were depriving him of legal materials relevant to the subject action. In that latter pleading, plaintiff listed his current place of confinement as the Maryland House of Correction and there is nothing in the Court's file to indicate a subsequent change.

2. Mr. Gray alleged that the small size of the cells, the lack of hot water, the presence of odorous commodes, and the overcrowded and unsanitary conditions within the Maryland House of Correction constituted cruel and unusual punishment in violation of the Eighth Amendment.

tionable relevance.[3] In addition, Mr. Gray moved for summary judgment on February 14, 1975. (See Paper No. 19). On March 26, 1975, this Court ruled on the pending motions before it and denied the defendants' Motion to Dismiss those allegations pertaining to the questionable constitutionality of the maintenance with inmate funds of non-interest bearing inmate accounts within the Maryland House of Correction. (See Paper No. 24). The defendants' Motion to Dismiss was granted as to the plaintiff's allegations of cruel and unusual punishment on the grounds that Mr. Gray's allegations were insufficient to state a claim for any deprivation of constitutional rights. The numerous documents filed by Mr. Gray which requested various forms of relief were denied by this Court for reasons set forth in the Order dated March 26, 1975. Since Mr. Gray's Motion for Summary Judgment made no mention of the matter of inmate accounts, which was at that time the only issue remaining in the case, that too was denied. The defendants then promptly moved for a summary judgment on April 7, 1975, (See Paper No. 25) on the grounds that the defendants are not depriving the inmate of his property without due process of law inasmuch as they are merely reserving the money for him until the time of his release and are not appropriating the funds forever for their own use. A *Roseboro* letter [4] was mailed to the plaintiff on October 17, 1975, (See Paper No. 26) informing him that the defendants had moved for a summary judgment and of his rights under Fed.R.Civ.P. 56. Plaintiff responded with an "Opposition Motion" in which he claimed that defendants' summary judgment motion was "not worthy of an answer" and he attached thereto a newspaper article citing the Anne Arundel County Grand Jury's difficulty in effecting reform at the Maryland House of Correction. (See Paper No. 27).

On May 6, 1977, Michael J. Travieso, Esquire, entered his appearance on behalf of the plaintiff and subsequently filed an amended complaint (See Paper No. 31) which listed the issues which are presently before this Court.[5] In this amended complaint brought on behalf of "all other inmates presently incarcerated in the several penal institutions under the control of the Division of Correction which require inmates to deposit funds into a Reserve Account in accordance with the rules and regulations of the Division of Correction", the plaintiff has set forth four counts which are listed as follows: (1) deprivation of property without due process of law; (2) confiscation of property without just compensation; (3) violation of the equal protection clause; and (4) breach of fiduciary duty. All of these counts relate to the allegedly unconstitutional manner in which inmate accounts are established and managed within Maryland's penal system.

On December 15, 1977, the defendants filed a Motion to Dismiss and an alternate Motion for Summary Judgment in which they defend the propriety of the various monetary policies of the Maryland Division of Correction. (See Paper No. 34). In support thereof, an affidavit was submitted by Mark A. Levine, then the Commissioner of the Division of Correction, the substance of which will be discussed *infra*.

On December 30, 1977, the plaintiff propounded interrogatories to the defendants (See Paper No. 36) and made requests for admissions (See Paper No. 37) in conformity with Fed.R.Civ.P. 36 and, after being granted an extension of time to respond, (See Paper No. 38) the defendants replied on March 20, 1978. (See Paper Nos. 40, 41 & 42). Answers to interrogatories were provided by William S. James, State Treasurer, and Mark A. Levine, Commissioner of the

---

**3.** *Viz.*, an essay authored by the plaintiff, addressed to The Harper's Magazine Co., and entitled "A Crime of Crimes".

**4.** *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975).

**5.** Michael Travieso withdrew his appearance as counsel for the plaintiff upon his appointment as an Assistant United States Attorney for the District of Maryland. On May 3, 1978, Robert B. Levin entered his appearance on behalf of the plaintiff class.

Division of Correction, and, with exceptions to be more fully discussed *infra*, the defendants complied with plaintiff's request for admissions.

On April 10, 1978, the plaintiff moved for summary judgment (See Paper No. 44) and on April 19, 1978, this Court ordered that the subject action be certified as a class action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2) (See Paper No. 47) and defined the class as "all persons presently incarcerated in State penal institutions who are subject to the Regulations of the Division of Correction of the Department of Public Safety and Correctional Services which govern the treatment of inmate funds and finances." [6] This action is presently before the Court on cross motions for summary judgment and the defendants have moved in the alternative for dismissal.

## INMATE ACCOUNTS

The subject action arises out of inmate objections to the manner and method in which money belonging to inmates is confiscated and managed by prison officials. In particular, the plaintiff objects to an inmate's inability to earn interest on funds kept within his or her "reserve account" within a given penal institution. The disposition of such a complaint necessarily requires an understanding of the institutional management of inmate funds.

Upon their initial entry into the Maryland penal system, inmates are provided with a handbook entitled *A GENERAL INFORMATION AND GUIDANCE MANUAL FOR INMATES* which provides an overview of the prisoner's rights and obligations while incarcerated. According to this manual, and pursuant to Division of Correction Regulation (DCR) 245–1, all money in an inmate's possession when he is received at the reception center of an institution is surrendered to the institution and a receipt is provided to the prisoner. DCR 245–1 4a. This money is then used to establish an "institutional account" for the inmate which includes not only the money surrendered by the prisoner upon his entry into the penal system but also any money received from any source outside of the institution, any money earned by the inmate while in the institution, and any money found in an inmate's possession in violation of prison regulations or directions.[7] This institutional account is made up of two distinct subparts: the reserve account and the spending account. The reserve account consists of the designated amount of $20.00 which is accumulated by the prison officials withholding approximately one-third of the inmate's earnings. DCR 245–1. The spending account, on the other hand, comes into being only after the required reserve amount has been set aside. This amount may be used by the inmate to purchase goods from the institution's commissary. Any amount in excess of $25.00 which is transferred into the inmate's commissary account or used for commissary purchases within any given week must first be approved by the managing officer or his staff designee within the institution. DCR 245–1 4d(2). In his answers to interrogatories propounded by the plaintiff, Mark Levine, the Commissioner of the Division of Correction, states that an inmate within Maryland's jurisdiction may transfer funds from his spending account into an individual savings account outside of the institution.[8]

---

**6.** By letter dated December 12, 1979, Mr. Levin, plaintiff's counsel, has informed the Court that he has not received any notice from any member of the class desiring not to be bound by this action. Therefore, all members of the class are bound by the Court's ruling in this action.

**7.** Such confiscated money is credited to the inmate's reserve account unless other ownership is established. This money cannot be spent by the inmate. Edward Gray has had $20.00 credited to his reserve account as a result of such confiscation.

**8.** How an inmate learns of this right to maintain a "free-world" savings account remains a mystery to the Court. The *General Information and Guidance Manual For Inmates* provided to the new inmates clearly states that all money in the inmate's possession is to be surrendered to the authorities at the institution to which the inmate has been committed. This manual makes no mention of the inmate's right to maintain an interest bearing savings account nor does it provide the procedure to be followed to establish such an account.

(See Paper No. 42). Indeed, as of March 1978, forty-one inmates of the Maryland House of Correction had opened interest bearing savings accounts with the Maryland National Bank. (See Defendants' Exhibit 4 to Paper No. 42). The question presently before this Court is whether an inmate is entitled to receive interest on the amount maintained in his reserve account and this the Court answers in the negative.

### RELEVANT LAW

While it is true that "[t]here is no iron curtain drawn between the Constitution and the prisoners of this country", *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), it is also true that prisoners' rights are frequently subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. *See also Bell v. Wolfish*, 441 U.S. 520, 544, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). *Id.* 418 U.S. at 556, 94 S.Ct. at 2974. A prisoner's constitutional rights are therefore necessarily balanced with the needs and objectives of the institution in which he is incarcerated. In order to more clearly consider the panoply of rights currently claimed by the plaintiff class and balance those rights with the needs of the institution, the Court will consider *seriatim* the constitutional deprivations alleged in plaintiff's amended complaint.

### I.

Whether individual members of the plaintiff class are deprived of property without due process of law, and whether their property is confiscated for public use without just compensation, as a result of the manner in which agents or employees of the Division of Correction and of the Department of Public Safety and Correctional Services, acting pursuant to rules, regulations, and policies enforced by the defendants acting under color of state law, confiscate from members of the class funds earned by those members and, in addition, refuse to pay to members of the class interest earned on those funds.

As discussed *supra*, one third of all monies earned by inmates from their various prison-sponsored labors is placed in the inmate's reserve account until the amount of $20.00 is accumulated. All monies in excess of $20.00 are placed in the inmate's spending account from which he can withdraw funds for commissary purchases or for deposit in a "free-world" savings account. The inmate's ability to control funds in his spending account, subject only to official approval for commissary purchases in excess of $25.00, precludes a finding that the inmate's money which has been placed in this account has in fact been unconstitutionally confiscated. Prison officials have a substantial interest in preventing the free-flow of currency inside the penal institution. Such a currency flow could conceivably facilitate gambling, bribery, extortion, and the purchase of contraband among the inmate population. *See Nix v. Paderick*, 407 F.Supp. 844, 846 (E.D.Va.1976). Division of Correction regulations which provide Maryland penal officials with the authority to regulate the flow of cash to the inmate population are clearly consistent with this interest and are not so intrusive of the property rights of the plaintiff class as to require this Court to strike them down. These regulations are rationally related to the state's valid interest in this matter.

Inasmuch as prisoners may transfer funds from their spending account to a "free-world" interest bearing savings account, this Court finds no difficulty in upholding the state's failure to pay interest on the inmates' funds held in the spending accounts throughout the Maryland correctional system. Since there is no evidence to indicate that the prison officials' failure to remit interest on the spending accounts of inmates and their acquiescence in the establishment of "free-world" accounts is an exaggerated response to the administrative problems inherent in the establishment and maintenance of interest bearing inmate accounts, this Court will defer to the judgment of such officials. *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974); *Bell v. Wolfish, supra* 441 U.S. at 546, 99 S.Ct. at 1878–79.

Further, in regard to plaintiff's due process claim arising out of the creation of the inmate's reserve account, there is a noticeable lack of authority in support of plaintiff's position. In fact, the few cases found which speak to this issue have held in favor of the defendants' position. In *Harris v. Yeager*, 291 F.Supp. 1015 (D.N.J.1968), aff'd 410 F.2d 1376 (3d Cir. 1969), for example, the Court was confronted with an inmate challenge to the constitutionality of an enforced savings account similar to the reserve account under challenge herein.[9] In granting the defendant's Motion for Summary Judgment and dismissing the complaint, that Court reasoned that

> [t]he moneys under consideration are not wages in a realistic economic employer-employee relationship. They are, rather, a gratuitous payment authorized by the State of New Jersey and made by virtue of an administrative policy prompted and advanced in the best interests of penology and sociology. The plaintiff has no inherent legal right to the payment of this gratuity, nor to determine its form or amount. The State Board has been given full power and authority, in the area of internal prison management, to engage healthy and capable inmates in productive occupations and to provide, in its best judgment, compensation therefor, be it cash or remission of time from sentence, or both. In the exercise of this statutory choice, the Board may establish a policy determining how, when, and if cash be selected, the amount, time and method of payment. The Board may, in its discretion and in the best interest of inmates, reasonably impose an enforced savings of a comparatively nominal amount to await the inmate's release or discharge from the institution.

*Id.* at 1017–18 (footnote omitted).

A more recent case out of the United States District Court for the Eastern District of Pennsylvania surveyed the law in this area and concluded that "the courts have yet to recognize a well-settled right, under any aspect of the due process clause, to earn interest on moneys received while incarcerated." *Smith v. Robinson*, 456 F.Supp. 449, 454 (E.D.Pa.1978). *See also Bijeol v. Benson*, 404 F.Supp. 595, 599 (S.D.Ind.1975).

The state's purpose in mandating the enforced savings of $20.00 in an inmate's reserve account is rationally related to a valid state goal, *viz.*, to provide an inmate with sufficient funds upon his release so as to enable him to contact friends or relatives and begin readjustment to the society at large. It should be noted that inmates receive this $20.00 amount upon their release even if they were unable to accumulate that amount in their reserve accounts during their tenure at the institution.

It should also be noted that Maryland officials contacted four state banks with which the state does business in an effort to solicit proposals for accounts wherein prisoners' reserve account funds would be included with the savings account of each participating inmate, thereby allowing him to draw interest on the $20.00. Maryland required that these accounts be set up in such a manner so as to preclude a withdrawal by the inmate which would have created a balance of less than $20.00. All four banks declined to submit proposals. (*See* Exhibits 1A through 1H to Paper No. 34).

The lack of an established constitutional right on the part of a prison inmate to draw interest on the funds maintained in his reserve account, together with this Court's reluctance to intervene in the administrative functions of the Maryland correctional system, requires a finding that plaintiff's first contention is without merit.

## II.

Whether individual members of the plaintiff class are deprived of a property inter-

---

9. In *Harris*, an inmate was challenging the administrative policy of the New Jersey State Prison which provided for the withholding of 20¢ on the dollar of an inmate's monthly earnings until the sum of $10.00 had been accumu-

lated. This money would then be deposited in a savings account for the benefit of the inmate and returned to him without interest at the time of his release or discharge from the institution. *Harris v. Yeager, supra* at 1016.

est without due process of law, and whether their property is confiscated for public use without just compensation, as the result of the policy enforced by the defendants under color of state law forbidding the establishment of a state or federally insured savings account by any inmate who desires to do so.

For relief, the plaintiff requests this Court to declare the right of the plaintiff and the members of his class to open state or federally insured savings accounts into which they may deposit any and all monies possessed by them, earned by them, or sent to them in any form. It is clear from the answers of Mark Levine to interrogatories propounded to him that members of the plaintiff class have already been permitted to open "free-world" savings accounts with all their money except that which is placed in the reserve account. With the exception of those funds placed in the reserve account, this portion of plaintiff's complaint is therefore moot. For reasons set forth *supra*, this Court also refuses to find a constitutional deprivation resulting from the forced savings resulting in the inmates' reserve account.

### III.

Whether individual members of the plaintiff class are denied equal protection of the laws as the result of defendants' enforcement under color of state law of the policies and practices herein challenged regarding defendants' control and use of the personal funds of inmates and interest earned thereon.

As stated *supra*, defendants' policies and actions in regard to the personal funds of inmates and the interest earned thereon are based upon policies which bear a rational basis for the attainment of valid state objectives. A claim based upon a denial of equal protection must therefore necessarily fail.

### IV.

Whether the defendants or any of them have violated a fiduciary duty which they owe to the plaintiff and his class.

Plaintiff alleges that the defendants are fiduciaries with respect to the plaintiff and members of the class "insofar as they have assumed custody and control over their funds" and, as such, have a fiduciary duty to put these funds to a use which is the most advantageous and beneficial to the plaintiff and his class. Plaintiff further alleges that the defendants breached this fiduciary duty by not allowing the plaintiff and his class members access to the funds so that they might deposit them in an interest bearing account; by not paying or crediting to the plaintiff and his class members the interest earned on their funds; and by not depositing their funds in accounts which earn the highest rate of interest available. Clearly, this is not a proper matter for review by a federal court. *See Urbano v. Board of Managers of New Jersey State Prison*, 415 F.2d 247, 256–57 (3d Cir. 1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970).