**Carl R. CHALMERS, # 116461,
Plaintiff,**

v.

**Andrew J. WINSTON, et al., Defendant.**

**No. C.A. 98–1714–AM.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 4, 2000.

Carl R. Chalmers, State Farm, VA, for plaintiff.

Mark R. Davis, Senior Assistant Attorney General, Office of the Attorney General, Criminal Law Division, Richmond, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, a prisoner in the custody of the Virginia Department of Corrections ("VDOC"), claims that VDOC's policy of retaining interest generated on the money he and other inmates earn while incarcerated violates the Takings Clause of the United States Constitution. Cross-motions for summary judgment are at bar.

### I

Plaintiff Carl R. Chalmers, a VDOC prisoner since February 23, 1979, complains that VDOC unconstitutionally retains interest generated on its prisoners' funds.[1] At all times relevant to this case, plaintiff has been incarcerated in the Powhatan Correctional Center ("PCC"). The first of two named defendants, Andrew J. Winston, is the Chairman of the Board of Corrections ("BOC"), the nine citizen entity that establishes VDOC prison policies, including the policies in issue here regarding prisoner accounts and the use of interest earned on those accounts. The second defendant, Ronald Angelone, is the Director of VDOC, and as such, administers Virginia's prison system. Plaintiff seeks both monetary and injunctive relief as to each defendant. Accordingly, plaintiff's complaint is construed as brought against defendants in both their official and their individual capacities.[2]

---

1. Three other prisoners filed similar lawsuits in the Eastern District of Virginia, each of which was resolved in favor of defendants. *See Washlefske v. Winston,* 60 F.Supp.2d 534 (E.D.Va.1999); *Gilreath v. Winston,* C/A No. 3:98cv757 (E.D.Va. March 16, 2000); *Titus v. Winston,* C/A No. 2:98cv1428 (E.D.Va. Jan. 6, 2000).

2. A federal court may not grant monetary relief against a state, even where a plaintiff seeks an injunction for recovery of past-due benefits. *See Edelman v. Jordan,* 415 U.S.

Prisoners in VDOC custody may earn money while incarcerated, but they may not retain currency. Thus, prisoners must keep their money in an account, either an outside bank account or one of the accounts provided by VDOC. According to policy set by the BOC, each prisoner must maintain at least $25.00 in an Inmate Trust Fund Account ("ITFA"), which money is disbursed to the prisoner at the time of his or her release. Toward that end, 10% of a prisoner's prison pay check is automatically placed into a so-called "hold account" within the ITFA until the value of that account reaches $25.00. Under the BOC's policy in effect prior to February 28, 1999, a prisoner's earnings over the $25.00 retained in the hold account, as well as any funds the prisoner receives from outside sources, were deposited exclusively in a "spend account" within ITFA, and the prisoner was free to use that money to purchase goods from the prison commissary or from approved outside sources. This BOC policy was amended on February 28, 1999. Under the amended policy, prisoners have an additional option; they may deposit funds in excess of the required $25.00 for the hold account in an outside bank account, provided that the outside account is managed by a third party.[3] And, like the former policy, the new policy also permits prisoners to maintain funds in excess of $25.00 in the ITFA spend account. Both the pre- and post-February 1999 policies limit prisoner spending to funds held in the ITFA spend account.

The Virginia Code authorizes the Director of VDOC to invest ITFA funds in state and federal bonds, or in federally-insured investments. *See* Va.Code § 53.1–44. Significantly, the interest or income generated from such investment does not accrue to each individual prisoner's spend or hold accounts. Instead, the statute provides that "[a]ny income or increment of increase received from the bonds or investments *may be used by the Director* for the benefit of the prisoners under his care." Va.Code § 53.1–44 (emphasis added). Pursuant to this statutory authorization, each prison deposits a portion of its ITFA funds in an interest-bearing checking account ("prison checking account") to provide funds for daily purchases from the prison commissary, and for disbursement of the hold account funds to prisoners being released. The remaining ITFA funds from each prison are pooled with ITFA funds from other VDOC prisons into a Local Government Investment Pool ("LGIP"). The funds in the LGIP are invested in approved bonds or federally-insured debt instruments, and the proceeds of this investment are then distributed to the various prisons in amounts proportional to the amounts the prisons contributed to the LGIP. The interest or income is distributed semiannually, and is currently distributed directly to each prison's commissary account, where the funds are used to purchase goods for the prisoners' benefit, such as magazine subscriptions and exercise equipment.

VDOC does not charge its prisoners a service fee for maintenance of the ITFA hold and spend accounts, and in any event, the costs of managing and maintaining the ITFA accounts at the various prisons ex-

---

651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The same rule applies whether a suit is brought directly against a state, or against a state official acting in his official capacity. *See id.* ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."). Consequently, plaintiff's request for monetary relief is construed as brought against Winston and Angelone not in their official capacities, but in their individual capacities. And against these monetary claims defendants may assert the defense of qualified immunity. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Construing the complaint in this manner avoids the Eleventh Amendment immunity defense raised by defendants.

3. Any interest that accrues on a prisoner's outside account accrues to his benefit, and is not at issue here.

ceeds the interest earned on the pooled ITFA funds in the LGIP and the prison checking accounts. For example, from the record, it appears that at PCC alone four employees are required to manage prisoner accounting, yet PCC received only $5,479.45 in interest income from the LGIP in 1998, and the prison checking account generates an average of $59.86 every month. This total interest income falls far short of the full costs incurred at PCC in administering the accounts. Given the administrative costs involved, VDOC does not currently trace the amount of interest generated by the ITFA funds in the LGIP or in the prison checking account that is attributable to each prisoner based on the prisoner's contributions. Indeed, were plaintiff to prevail in this matter, VDOC asserts it would simply refuse to invest ITFA funds to avoid the substantial unreimbursed costs of administering and disbursing the interest earned by the LGIP and prison checking account funds. According to VDOC, it lacks the resources and expertise to determine, in a cost-effective way, the interest to which each prisoner would be entitled.

Nonetheless, plaintiff contends that any interest generated on his money in the ITFA spend and hold accounts should be attributed to him, and that the VDOC's policy of retaining the interest, and spending it for the benefit of the prison population, violates the so-called Takings Clause of the Fifth Amendment. The parties have filed cross-motions for summary judgment as to the merits of plaintiff's constitutional claim, and defendants also raise the defenses of qualified immunity and Eleventh Amendment immunity from an award of damages. The material facts are essentially undisputed and the matter is ripe for disposition.

**II**

■ As to both plaintiff's takings claim and defendants' qualified immunity defense,[4] the threshold question is "whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000). And in this case, the question presented is whether defendants' failure to apportion to plaintiff his share of interest and other income generated by the ITFA funds constitutes an unconstitutional taking of private property without just compensation in violation of the Fifth Amendment.[5] The starting point in the analysis of this question is the text of the Fifth Amendment's Taking Clause.[6] This text makes clear that any takings analysis includes three primary inquiries, namely (i) whether the *res* claimed to be taken is actually "private property," (ii) whether that property was "taken for public use," and (iii), if so, whether the government provided "just compensation" for the property. *See, e.g., Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (noting the three inquiries in a takings analysis, though resolving only the first). In this case, analysis need go no further than the second inquiry, as it is dispositive here.

■ The first inquiry in the context of this case, is whether plaintiff has a property right in the interest earned on the funds in his ITFA spend and hold accounts, which funds are pooled with the funds of

---

4. To overcome an official's defense of qualified immunity, a plaintiff must show that, at the time of the alleged violation, a "reasonable official" would have known that his actions violated the Constitution. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

5. The applicability of the Takings Clause to the states, and hence to VDOC, has been established for more than a century. *See Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

6. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

other inmates in the prison checking account and in the LGIP. While the Constitution protects property rights, it does not create them, and the question whether a particular interest represents a property right must therefore be made "by reference 'to existing rules or understandings that stem from an independent source such as state law.'" *Phillips*, 524 U.S. at 164, 118 S.Ct. 1925 (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Certain property rights are created by statute, and the extent of those property rights is determined by reference to the statute creating the right.[7] Other property rights exist independently of any statute, and derive from fundamental principles of a state's property law.[8] And, although states may regulate property rights, they may not declare, by legislative fiat, that a fundamental principle of property law does not apply in a certain circumstance, without triggering Takings Clause scrutiny.[9] Put another way, "a State, by ipse dixit, may not transform private property into public property without compensation." *Webb's Fabulous*

*Pharmacies, Inc., v. Beckwith,* 449 U.S. 155, 164, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

■ Thus, the common law principles of Virginia property law, as well as any relevant sections of the Virginia Code, determine whether the interest generated on a prisoner's ITFA accounts is the prisoner's private property. *See Phillips*, 524 U.S. at 164, 118 S.Ct. 1925. In that regard, the Supreme Court in *Phillips* found that, at common law, any interest generated on a fund was the private property of the owner of that fund. *See Phillips*, 524 U.S. at 165, 118 S.Ct. 1925 (acknowledging the common law principle that "interest shall follow the principal as the shadow the body.") (quoting *Beckford v. Tobin*, 1 Ves. Sen. 308, 310, 27 Eng.Rep. 1049, 1051 (Ch.1749)).[10] Similarly, the conclusion that this general rule is a background principle of property law in Virginia finds ample support in the case law [11] and, in any event, is not contested by defendants. In light of this, *Phillips* compels the conclusion that, just as a lawyer's clients have a property right in interest

---

7. *See Roth*, 408 U.S. at 577–78, 92 S.Ct. 2701 (noting that a statute may "create[ ] and define[ ]" the contours of certain property rights).

8. *See Phillips*, 524 U.S. at 166–67, 118 S.Ct. 1925; *see also Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1200–01 (9th Cir. 1998) (noting that there is a "core notion" of property rights determined by reference to "traditional 'background principles' of property law").

9. *See Phillips*, 524 U.S. at 167, 118 S.Ct. 1925 ("[A] State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law."); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (referring to common law nuisance principles in determining whether a state regulation violated the Takings Clause); *Schneider*, 151 F.3d at 1200 ("[T]here is … a 'core' notion of constitutionally protected property into which state regulation simply may not intrude without prompting Takings Clause scrutiny.").

10. The Supreme Court found that "this rule has become firmly embedded in the common law of the various States." *Phillips*, 524 U.S. at 165 & n. 5, 118 S.Ct. 1925 (citing state law cases for the general proposition).

11. *See* 10B Michie's Jurisprudence of Virginia and West Virginia § 3 ("The doctrine of interest is founded on good conscience and correct morals; it is natural justice that one who has the use of another's money should pay interest on it. Interest follows the principal as the shadow the substance.") (footnotes omitted); *see also Parsons v. Parsons*, 167 Va. 374, 189 S.E. 448, 452 (1937) (noting the general rule "that interest 'is a legal incident of the debt' and follows the principal after maturity as 'the shadow follows the substance.'"); *Goins v. Garber*, 131 Va. 59, 108 S.E. 868, 871 (1921) (noting the general rule); *cf. Washington & O.D. Ry. v. Westinghouse Electric & Mfg. Co.*, 120 Va. 620, 89 S.E. 131, 134 (1916) ("When the action is founded upon a promise … to pay money at a given day, interest on the principal sum from that day is a legal incident of the debt, and the right to it founded on the presumed intention of the parties.").

generated on IOLTA funds, so, too, do prisoners have a property right in any interest generated by funds contributed to the ITFA.[12] And, significantly, every court to consider this issue since *Phillips* has uniformly reached the same conclusion.[13]

Plaintiff's status as a prisoner does not change this conclusion. Although a prisoner loses certain rights by virtue of incarceration, it is settled that a prisoner maintains all constitutional rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Turner v. Safley*, 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (citation and internal

quotation marks omitted).[14] The record does not reflect that a prisoner's property right to interest generated on his funds is inconsistent with either his "status as a prisoner" or with Virginia's penological goals.[15] And, although a state does not have a constitutional obligation to place a prisoner's money in an interest-bearing account,[16] as noted above, the state may not, by legislation, eliminate a prisoner's property right in interest that is actually generated by that money. *See, e.g., Webb's Fabulous Pharmacies*, 449 U.S. at 164, 101 S.Ct. 446. Thus, while VDOC has "great latitude" in the management of prisoner funds on deposit with the prison, and ac-

**12.** *See Phillips*, 524 U.S. at 172, 118 S.Ct. 1925; *see also Webb's Fabulous Pharmacies*, 449 U.S. at 162, 101 S.Ct. 446.

**13.** At least three other courts in this district, presented with essentially the same facts as those at bar, have determined that *Phillips* compels the conclusion reached here. *See Washlefske v. Winston*, 60 F.Supp.2d 534, 539 (E.D.Va.1999); *Gilreath v. Winston*, C/A No. 3:98cv757 (E.D.Va. March 16, 2000); *Titus v. Winston*, C/A No. 2:98cv1428 (E.D.Va. Jan. 6, 2000). And a panel of the Ninth Circuit recently reached this conclusion with respect to California's penal system, which had implemented a prisoner account policy similar to Virginia's. *See Schneider v. California Department of Corrections*, 151 F.3d 1194, 1199–1201 (9th Cir.1998) (holding that a prisoner has a property interest in interest generated on his funds held in a prison account).

In addition, some courts had reached the same or a similar conclusion prior to *Phillips*. *See, e.g., Eubanks v. O.L. McCotter*, 802 F.2d 790, 793–94 (5th Cir.1986) (finding a colorable basis for federal jurisdiction in prisoner's claim that the state had retained interest on an Inmate Trust Fund in violation of the Constitution, though not otherwise considering the merits of the claim). Generally, however, until *Phillips*, courts had ruled that a prisoner's property right to interest generated on his or her prison accounts existed, if at all, only by virtue of a state statute. *See Tellis v. Godinez*, 5 F.3d 1314, 1317 (9th Cir.1993) (finding property right to interest based on state statute); *Abdul–Wadood v. Bayh*, 85 F.3d 631, 1996 WL 219068, at **2 (7th Cir. Apr.30, 1996) (unpublished disposition) (finding that prisoner had no property right to interest generated on his prison account, because state law did not create such a right); *Fayerweather v. Wainwright*, No. TCA 75–3

(N.D.Fla. Aug. 20, 1976), *digested in* Pov. L.Rep. ¶ 23,325 (CCH 1976) (holding that a prisoner had a statutory and, hence, constitutional right to interest generated on his prison account).

**14.** Accordingly, defendants' reliance on *Ruffin v. Commonwealth*, for the proposition that, at common law, prisoners were "slaves of the State" is unwarranted. *See Ruffin v. Commonwealth*, 62 Va. (21 Gratt.) 790, 796 (1871). It is now established that "[a] prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him at law." *Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir.1944). In fact, Virginia has long recognized that prisoners do not forfeit "the right ... to take, hold, and dispose of his property, real and personal." *Haynes v. Peterson*, 125 Va. 730, 100 S.E. 471, 472–73 (1919). Accordingly, plaintiff has the same property right in interest actually generated on his funds as a free person.

**15.** *But cf. Mitchell v. Kirk*, 20 F.3d 936, 938 (8th Cir.1994) (holding that the state's decision to provide only non-interest bearing accounts to its prisoners was based on a legitimate penological objective, while not reaching the question whether prisoners had a property right in the interest generated).

**16.** *See, e.g., Foster v. Hughes*, 979 F.2d 130, 132–33 (8th Cir.1992) (finding that the state's legitimate penological objectives outweighed any constitutional right a prisoner might otherwise have to place his money in an interest-bearing account); *Gray v. Lee*, 486 F.Supp. 41, 46 (D.Md.1980) (finding no constitutional right to earn interest on money received by a person while he is incarcerated).

cordingly may determine whether those funds will generate interest, "any interest that does accrue attaches as a property right incident to the ownership of the underlying principal." *Phillips*, 524 U.S. at 168, 118 S.Ct. 1925. Indeed, a person has a property right in interest generated on his funds, even where, as here, the principal generates interest exclusively by virtue of the government's action. *See Phillips*, 524 U.S. at 171, 118 S.Ct. 1925 (rejecting the so-called "government created value argument" that, because a state statute enabled the generation of interest, the interest was not private property).[17] In short, "the State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest." *Webb's Fabulous Pharmacies*, 449 U.S. at 162, 101 S.Ct. 446.

■■■ Thus, plaintiff has a property right in any interest earned on his contributions to the ITFA, including that portion of interest generated by the LGIP and the prison checking account attributable to his funds. Yet, that does not end the analysis, as the second inquiry under the Takings Clause is whether VDOC's ITFA policies constitute a "taking" of plaintiff's property right to the interest. The question whether a particular governmental action represents the taking of private property, or is instead a valid regulation of private property, involves an "essentially ad hoc, factual inquir[y]." *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Courts undertaking this ad hoc, fact-based inquiry[18] typically do so by reference to the so-called *Penn Central* factors, namely, (i) the nature of the governmental action, (ii) the economic impact of the governmental action on the person, and (ii) the person's "distinct investment-backed expectations" in the allegedly taken property right. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.[19]

**17.** The facts of *Phillips* illustrate the extent of this principle. At issue in *Phillips* was Texas's Interest on Lawyers Trust Account ("IOLTA") program. *See* 524 U.S. at 160–63, 118 S.Ct. 1925. An IOLTA account is simply an interest-bearing checking account into which a lawyer may place a client's money, and which, in Texas, generates interest on behalf of the Texas Equal Access to Justice Foundation ("TEAJA"). *See id.* at 162–63, 118 S.Ct. 1925. Yet, due to a complex web of banking regulations and ethical rules of practice, the only client funds placed into IOLTA accounts are funds that would not otherwise generate interest. *See id.* at 161–62, 118 S.Ct. 1925. Nonetheless, the Supreme Court ruled that any interest generated on IOLTA accounts was the private property of the clients whose money was in those accounts. *See id.* at 172, 118 S.Ct. 1925.

**18.** In certain cases, this factual inquiry is not necessary, as government action that constitutes a "permanent physical occupation" of private property is a taking *per se*, notwithstanding whether the person whose property is occupied suffers any economic harm, and the sole question in that event is what compensation is just. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441, 102 S.Ct. 3164, 3179, 73 L.Ed.2d 868 (1982). And, although on a metaphorical level VDOC has "permanently occupied" the interest earned on prisoner accounts, the Supreme Court has determined that a regulation that deprives a person of money is not a "permanent physical occupation" of that person's property, because, "unlike real or personal property, money is fungible." *United States v. Sperry Corp.*, 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989). It follows that a government regulation that deprives a person of interest generated on that person's principal is not a "permanent physical occupation" of property, but is, rather, "interference [that] arises from some public program adjusting the benefits and burdens of economic life to promote the public good." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *see also Washington Legal Foundation v. Texas Equal Access to Justice Foundation*, 86 F.Supp.2d 624, 2000 WL 257372, *20 (W.D.Tex.2000) (holding that alienation of interest from principal did not involve a *per se* taking); *Washlefske*, 60 F.Supp.2d at 541 (same). Accordingly, the government's action in this case is not a *per se* taking of plaintiff's property and each of the *Penn Central* factors must be considered.

**19.** *See Esposito v. South Carolina Coastal Council*, 939 F.2d 165, 169–70 (4th Cir.1991) (applying the three factors); *see also Washlefske*, 60 F.Supp.2d at 541–42 (applying factors to deprivation of prisoner's interest); *Washington Legal Found. v. Texas Equal Access to Justice Found.*, 86 F.Supp.2d 624,

■ In this case, none of the relevant factors suggest that the governmental action in this instance represents the taking of private property.[20] The first factor is whether the nature or character of the governmental action suggests that a taking occurred. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. *Penn Central* recognized that a spectrum of governmental activity exists; thus, a governmental action that involves the "physical invasion" of a person's property is more likely to represent the taking of a property right than is a "public program adjusting the benefits and burdens of economic life to promote the common good." *See id.* Here, the government's action is more akin to a "public program ... to promote the common good" than a "physical invasion." [21] Given the relatively small amount of money each prisoner keeps on deposit in the ITFA, VDOC cannot maintain interest-bearing hold and spend accounts in a cost effective way, because the cost of maintaining interest-bearing accounts for each prisoner would be greater than any interest the accounts might generate.[22] Thus, were VDOC required to trace the interest generated on the ITFA to each prisoner, it would simply not invest the funds, as the costs of tracing and distributing the interest to each prisoner would far exceed the interest earned from the investment. Put another way, VDOC achieves necessary economies of scale by avoiding the administrative costs associated with maintenance of individual interest-bearing accounts. Thus, the nature of the governmental action in this case suggests that plaintiff's private property was not subject to an unconstitutional "taking," as the prison system could not economically administer individual, interest-bearing accounts for its prisoners.[23] In short, VDOC's administra-

2000 WL 257372 (W.D.Tex.2000) (applying factors to interest generated on IOLTA accounts).

20. In *Phillips,* the Supreme Court was presented with the limited question whether the interest generated on the IOLTA accounts was the property of the owners of the principal in the accounts. Accordingly, the Supreme Court did not address whether the state's actions constituted a taking of that property without just compensation, and remanded the case for such determination. *See Phillips,* 524 U.S. at 172, 118·S.Ct. 1925. On remand, the district court determined that Texas's IOLTA program did not represent a taking of private property, in part because under 12 U.S.C. § 1832(a) a lawyer may not deposit a client's funds in an interest-bearing checking account that accrues interest for the benefit of the client, the lawyer, or any other individual or entity not exempted by federal law. *See Washington Legal Found. v. Texas Equal Access to Justice Found.,* 86 F.Supp.2d 624, 646 (W.D.Tex.2000) ("[I]n the absence of IOLTA, the money would necessarily generate no interest for anyone but the banks.").

21. Defendants suggest that the interest is properly withheld as a "fee for services" to cover the cost of managing the prisoner accounts. *See United States v. Sperry,* 493 U.S. 52, 63, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) ("[A] reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services."). Yet, this contention

is belied by the record, which indicates that no part of the interest generated by the prisoner accounts is used to pay for the cost of those accounts. Instead, as noted, the interest is transferred to the Commissary Fund.

22. Plaintiff, for example, had an average monthly balance of $222.31 from May 17, 1998 to November 17, 1998. Indeed, the record reflects that the interest generated by the ITFA would not now cover the cost of administering the ITFA, notwithstanding VDOC's current practice of not attributing to each prisoner the interested by that prison.

23. *Cf. Webb's,* 449 U.S. at 163–64, 101 S.Ct. 446. In *Webb's,* the Supreme Court held that a court may not retain interest generated by funds placed in an interpleader account, when the exaction of interest is in addition to the fee charged for maintenance of the account. *See id.* In that event, the government action represents "a forced contribution to general government revenues" that is "not reasonably related to the costs of using the courts." *Webb's Fabulous Pharmacies,* 449 U.S. at 163, 101 S.Ct. 446. In this case, the record reflects that the cost of apportioning and distributing ITFA interest to each prisoner would overwhelm the value of any interest generated. Furthermore, unlike the depositor in *Webb's,* the prisoners are not charged a service fee for the maintenance of their accounts. Consequently, in this case, unlike *Webb's,* the government policy actually "ad-

tion of the hold and spend accounts "adjust[s] the benefits and burdens of economic life to promote the common good," and creates value where none existed before. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.[24]

The second inquiry, which focuses on the economic impact of the governmental action, also points persuasively to the conclusion that no taking occurred, as plaintiff has suffered no economic harm as a result of VDOC's policy.[25] Under the current ITFA policy, VDOC may invest the ITFA funds and use the proceeds therefrom for the benefit of all prisoners. And, as noted, it is undisputed that it is uneconomical for VDOC to trace the interest generated by ITFA to each individual prisoner. Thus, were VDOC forced, by law, to choose between (i) tracing and apportioning the ITFA interest attributable to each prisoner individually, and (ii) forgoing the investment of the ITFA funds altogether, VDOC would choose the latter course, as the former would be uneconomical. In that event, plaintiff's principal would generate no interest, while he and his fellow prisoners would lose the benefit of the goods and

services purchased for their use with interest generated from the investment of ITFA funds.[26] In light of these considerations, it is plain that the governmental action in this case has had, and will have, no measurable economic impact on plaintiff.

And, for similar reasons, the third *Penn Central* factor does not operate in plaintiff's favor, as plaintiff does not now have, nor has he ever had, a reasonable, investment backed expectation that his funds in the ITFA hold and spend accounts would generate interest. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. First, plaintiff lacks a constitutional right to earn interest on money held on his behalf by the prison.[27] Second, VDOC does not have a statutory obligation to place prisoner funds into interest bearing accounts, as Virginia law gives the director of VDOC discretion to invest the funds, but does not require him to do so.[28] Thus, plaintiff cannot claim a reasonable expectation that money deposited into the ITFA will generate interest, as VDOC at any time may simply forgo investing prisoner funds altogether.[29]

just[s] the benefits and burdens of economic life to promote the common good," and does not represent a "forced contribution to general governmental revenues." *See Webb's Fabulous Pharmacies*, 449 U.S. at 163, 101 S.Ct. 446; *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.

24. This conclusion finds further support in the current policy, as a prisoner may now choose to place his money into an outside, interest-bearing account. Of course, this choice is constrained by the fact that a prisoner must maintain $25.00 in the hold account, and also may well wish to maintain a certain amount in the spend account for daily use. Nonetheless, that VDOC offers its prisoners a choice of maintaining outside, interest-bearing accounts suggests that it does not seek to harvest interest which would otherwise accrue to the prisoners' benefit.

25. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.

26. Although the record makes clear that the interest generated on the LGIP is used to purchase goods and services for the prisoners' benefit, the record does not reflect what

use is made of interest generated on the prison checking account. This omission in the record does not affect the analysis, as any use of that interest would have no economic impact on the prisoner. VDOC cannot economically maintain individual interest-bearing accounts, and would place all ITFA funds, including those deposited in the prison checking account, into non-interest-bearing accounts were it required to trace interest attributable to each prisoner.

27. *See, e.g., Foster v. Hughes*, 979 F.2d 130, 132–33 (8th Cir.1992); *Gray v. Lee*, 486 F.Supp. 41, 46 (D.Md.1980).

28. *See* Va.Code § 53.1–44 ("Portions of the funds held by the Director or by any state correctional facility, which belong to prisoners may, *in the discretion of the Director*, be invested...." ) (emphasis added).

29. By contrast, a prisoner who takes advantage of the current policy, and places a portion of his money into an outside, interest-bearing account, does have a reasonable expectation that the money in the account will

For these reasons, VDOC's ITFA policy does not "take" plaintiff's property, but instead, is a valid regulation for which no compensation is required. Accordingly, summary judgment is appropriate without addressing the third inquiry in a takings analysis, namely whether VDOC provided "just compensation" for the use of plaintiff's property.[30]

Therefore, summary judgment will be entered for defendants, and plaintiff's claim will be dismissed. An appropriate order will enter.

be invested, and that any interest generated on that money will accrue to his benefit. But this expectation derives from the prisoner's contractual relationship with the bank or other institution holding his money on account, a relationship that the prisoner does not have with the prison. Thus, a bank has a contractual obligation to pay interest according to the terms of the account, and to ensure that it can meet those terms, the bank must invest the prisoner's money. A prison, on the other hand, has no obligation to pay interest on money it holds for its prisoners, and hence, the prisoner has no reasonable expectation that the prison will invest his money for his benefit.

**30.** Nor is it necessary to address defendants' defense of qualified immunity, as defendants did not violate plaintiffs' constitutional rights. *See Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000). In any event, assuming, *arguendo,* that VDOC's ITFA policies violated the Takings Clause, there is no authority in this or any other circuit that would have made that fact clear to "an objectively reasonable official in the defendants' position." *See Porterfield v. Lott,* 156 F.3d 563, 567 (4th Cir.1998). Accordingly, in that event, the defense of qualified immunity would bar plaintiffs' request for damages.